## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

III INNOVATIONS, INC., and ) 
SARGE HOLDINGS COMPANY, LLC, ) 
    Plaintiffs/Counter-Defendants, )    Case No.: 13-cv-05102 
v. )    Judge Manish Shah
DAVID PACHOLOK, ) 
    Defendant/Counter-Plaintiff. ) 

### PACHOLOK'S MOTION AND INCORPORATED MEMORANDUM OF LAW TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT PURSUANT TO FRCP RULE 12(B)(1)

**NOW COMES**, the defendant, David Pacholok (herein "Pacholok" or "David"), by and through his undersigned counsel, Waltz, Palmer & Dawson, LLC, and hereby files his motion and memorandum of law to dismiss the second amended complaint filed on June 12, 2014 ("Second Amended Complaint") filed by Induction Innovations, Inc. ("III") and Sarge Holdings, LLC ("Sarge") (III and Sarge shall be collectively referred to as "Plaintiffs") for lack of subject matter jurisdiction.

## I.    INTRODUCTION

This is Plaintiffs' third attempt to file a complaint able to establish subject matter jurisdiction. Plaintiffs' first two complaints were withdrawn before the complaints could be evaluated by the Court. For the reasons set forth below, Plaintiffs' third attempt at pleading is as flawed as the first two attempts.

This litigation largely concerns the ownership and use of two patents, USPN 6563096 and 6670590 ("the Patents") currently jointly owned by David and Sarge. David and Thomas Gough("Gough" or "Tom Gough") are the inventors of the Patents, and David and Gough also founded III (Second Amended Complaint #5). David was a co-owner, director and officer of III

until December, 2006, when David sold his shares and resigned through a stock purchase agreement ("SPA") (Second Amended Complaint #19). The SPA contained a formula for payment to David for products sold by III after David left III (Motion Exhibit #1, Affidavit of Tom Gough, #5, Affidavit Exhibit B, SPA, #3E). III also claims that it has equitable title to the Patents and seeks legal title to the Patents.

On June 12, 2014, the Plaintiffs filed the Second Amended Complaint containing five (5) claims, although Plaintiffs have two Count II's. (Second Amended Complaint, Doc. #135). The Second Amended Complaint consists of: a declaratory judgment action regarding patent infringement; claim for patent infringement against Pacholok based upon III's claim of equitable title; a breach of fiduciary duty and implied contract claim for assignment of the Patents to III; a declaratory judgment action regarding David's entitlement to payment under the SPA after David left III; and a claim for intentional interference with business relations against David by III (III contends David continued to contend to third parties that David was affiliated with III after he left in 2006). See Second Amended Complaint, Doc. #135. As discussed below, only the declaratory judgment action for inventorship and claim for patent infringement arise under the federal Patent laws.

**The Two Federal Counts Must Be Dismissed for Lack of Standing**

The Second Amended Complaint admits that Sarge jointly holds legal title to the Patents with David (See Second Amended Complaint #43). III has assigned its rights in the Patents to Sarge in 2013 (See Motion Exhibit #2, Assignment from III to Sarge ("2013 Assignment")). As discussed below, Plaintiffs have no standing to contest inventorship as Sarge is protected by legal title, and III has abandoned all title interests in the Patents in 2013. David has informed Plaintiffs

since February, 2014, that he has chosen not to further contest inventorship[1] against Sarge and III

and files a covenant not to sue with this motion (Motion Exhibit #3, Covenant Not to Sue). The

covenant not to sue conclusively eliminates standing as to Count I of Plaintiffs' Second Amended

Complaint.

The Second Amended Complaint admits Pacholok owns partial legal title in the Patents,

and Plaintiffs do not have full legal title to the Patents. See Doc. # 135, ¶¶ 42-47. This fact alone

bars Count II, a patent infringement claim as discussed below. Judicial admissions in previous

pleadings and motions also bar standing for the patent infringement claim as discussed below.

Moreover, contrary to Plaintiffs' contentions, Plaintiffs cannot base standing on equitable title to

the Patents due to judicial admissions barring Plaintiffs' claims of equitable title. Plaintiffs argue

that they have equitable title to the Patents pursuant to Illinois fiduciary principles and/or an

implied contract arising from Pacholok's separation from III in 2006. However, Plaintiffs filed an

affidavit in support of their motion for temporary restraining order which contains and

authenticates two exhibits, a stock purchase agreement ("SPA") and recorded assignments

executed in 2006-2007 and in 2008 ("2007 Assignment" and "2008 Assignment"). The SPA and

assignments bar any contention of equitable title in the Patents by III for the reasons discussed

below.

**The Court has No Supplemental Jurisdiction for the Remaining State Law Claims**

All remaining claims in Plaintiffs' Second Amended Complaint arise under state law. All

such claims must be dismissed for lack of subject matter jurisdiction. Most of the state law claims

must be dismissed under any circumstance because the state law claims do not arise from the same

---

[1] David did file a counterclaim to correct inventorship as part of his answer to Plaintiffs' Complaint. However, that answer and counterclaim was rendered null and void by the amended complaint. *Doe v. Williston Northampton School,* 766 F.Supp.2d 310, 313-314 (D. Mass. 2011).

nucleus of operative fact as the federal claims. Moreover, if the federal claims are dismissed, the Court has no jurisdiction of the state law claims.

## II.        Standards on Ruling on a Motion to Dismiss for Lack of Subject Matter Jurisdiction

A FRCP 12(b)(1) motion challenges the court's subject matter jurisdiction. *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). The plaintiff must allege a nonfrivolous federal cause of action to establish subject matter jurisdiction. *Jim Arnold Corporation v. Hydrotech Systems, Inc.* 109 F.3d 1567, 1571-1572 (Fed. Cir. 1997). Ownership disputes over patent rights do not arise under the Patent laws, and thus do not provide a basis for federal jurisdiction. *New Marshall Engine Co. v. Marshall Engine Co.,* 223 U.S. 473, 479 (1912); *Becher v. Contoure Laboratories, Inc.*, 279 U.S. 388 (1929); *Jim Arnold Corporation, supra,* 109 F.3d at 1578. Moreover, a Rule 12(b)(1) motion is proper to challenge both subject matter jurisdiction and jurisdictional requirement of standing under Article III of the Constitution. *CGM, LLC v. BellSouth Telecommunications, Inc.,* 664 F.3d 46, 52 (4th Cir. 2011). The existence of a case and controversy is a prerequisite for the exercise of federal judicial power under Article III. *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1002 (7th Cir. 2004). Plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 504, 561 (1992); see *also Retired Chicago Police Association v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).

Under the well pleaded complaint rule, a party cannot rely upon a counterclaim to establish subject matter jurisdiction. *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.,* 535 U.S. 826, 830-832 (2002). Rather, subject matter jurisdiction must be established by the complaint. *Id.* Therefore, the Plaintiffs must establish both standing and subject matter jurisdiction in their Second Amended Complaint for this case to proceed forward.

In determining whether the Court has subject matter jurisdiction over a claim and Plaintiffs

4

have standing to sue, the Court can and should consider outside evidence to determine whether subject matter jurisdiction exists. *United Phosphorus Limited v. Angus Chemical Co.,* 322 F.3d 942, 946 (7th Cir. 2003) *overruled on other grounds,* 683 F.3d 845. The Court is not bound by the allegations in the complaint and can look to whatever evidence is submitted on the issue to determine whether subject matter jurisdiction exists. *Leveski v. ITT Educational Services, Incorporated* 719 F.3d 818, 828 (7th Cir. 2013). The burden of proof is on the Plaintiffs, and the Court can weigh evidence and may have to conduct an evidentiary hearing to determine whether subject matter jurisdiction exists. *United Phosphorus Limited,* 322 F.3d at 946. A frivolous federal claim designed to bring a case into federal court does not provide the Court with subject matter jurisdiction. *Id.* at 948-950.

The Court can take judicial notice of most of the documents attached to this Motion. The Assignments attached to the motion to dismiss are recorded government records which the Court can take judicial notice of. *Denius v. Dunlop,* 330 F.3d 919, 925 (7th Cir. 2003). The Court can also take judicial notice of court documents filed in this and other cases, including most importantly, Plaintiffs' Motion for Temporary Restraining Order, Motion for Preliminary Injunction, and Tom Gough's affidavit in support of Plaintiffs' Motion for Temporary Restraining Order and the authenticated exhibits attached to the affidavit and motion. *Ennenga v. Starns,* 677 F.3d 766, 773-774 (7th Cir. 2012).

### III.     Judicial Admissions and Judicial Estoppel Bars any Claim that Plaintiffs Have Full Legal Title for Purposes of this Case or To Contradict Tom Gough's Affidavit in Any Way

Judicial admissions are any 'deliberate, clear, and unequivocal' statement, either written or oral, made in the course of judicial proceedings qualifies as a judicial admission." *Murrey v. United States,* 73 F.3d 1448, 1455 (7th Cir. 1996); *Pierce v. City of Chicago,* 2012 U.S. Lexis 14331 (N.D. Ill. 2012). Judicial admissions remove a matter from contention and eliminate the need for

evidence. *Id.* An admission as to who holds title to a piece of property is a judicial admission. *Gambino v. Boulevard Mortgage Corporation,* 922 N.E.2d 380, 411; 398 Ill.App.3d 21 (2009). Here, Tom Gough's affidavit filed in support of III's Motion for Preliminary Injunction, III's Motion for TRO, III's Motion for Preliminary Injunction, and the Second Amended Complaint contain judicial admissions which bar many of Plaintiffs' claims.

Judicial estoppel bars a plaintiff from successfully taking a position, and then taking the opposite position to obtain further gains. *The Medicines Co.. v. Mylan, Inc.* 2014 U.S. Dist. Lexis 38714 (N.D. Ill. 2014). Here, Plaintiffs filed a motion for preliminary injunction and motion for temporary restraining order admitting that Plaintiffs do not have full legal title in the Patents. Plaintiffs further claimed a need for injunction preventing licensing of the Patents by David. Plaintiffs also filed an affidavit of Tom Gough in support of their motion which they cannot now contradict. Plaintiffs obtained an agreed order that David would not further license the Patents during the pendency of this litigation. Plaintiffs cannot change their story now after using claims of partial legal title to obtain a benefit in this litigation. Any argument which contradicts the affidavit and motions for temporary restraining order and temporary injunction must thus be barred.

## IV. Count I: Plaintiffs Have No Standing to Bring Suit for Declaratory Judgment to Determine Inventorship

### A. Plaintiffs Have No Standing to Seek Declaratory Judgment for Inventorship

In order to have standing for declaratory judgment, there must be an actual injury and redressibility. *Larson v. Correct Craft, Inc.,* 569 F.3d 1319, 1326 (Fed. Cir. 2009). When assignments to the title to the patents in question exist, most parties generally have no standing to challenge inventorship of the patents unless those assignments are first rescinded in state court. *Id.* at 1325-1327. Specifically, the party must show a financial interest as to why there is a financial

(or possibly reputational) interest in inventorship. *Id.* In this case, III assigned all rights to the Patents (See Motion Exhibit #2). III thus has no possible interests in the Patents. Sarge also has no financial interest in inventorship because Sarge shares undivided legal title in the Patents.

**B.      A Covenant Not To Sue Eliminates Standing.**

A declaratory judgment action becomes moot and no longer a case and controversy if a party files a covenant not to sue. *Dow Jones & Co. v. Ablaise, Ltd.,* 606 F.3d 1338, 1346 (Fed. Cir. 2010). Here, David has filed a covenant not to sue as to the issue of inventorship with this motion thus eliminating standing. The covenant not to sue conclusively extinguishes standing regarding Plaintiffs' claim.

**C.      If the Court Finds Jurisdiction Could Possibly Exist, the Court Should Exercise its Discretion and Decline Jurisdiction over the Declaratory Judgment Action for Inventorship**

The Court has substantial discretion in determining whether to decline jurisdiction over a declaratory judgment action. *Medimmune, Inc. v. Genentech, Inc.* 549 U.S. 118, 136; 127 S.Ct. 764 (2007). Here, even if the Court finds a basis for jurisdiction, the Court should decline to exercise jurisdiction. The declaratory judgment action was tacked on after David tried to withdraw his inventorship claims; where David has repeatedly stated that he is not pursuing the issue of inventorship; where David has agreed not to sue unless inventorship is challenged by a third party; and the declaratory judgment action on inventorship has been pleaded after a year solely in order to obtain federal subject matter jurisdiction. The Court should decline jurisdiction even if the Court finds a case or controversy exists regarding inventorship.

**V.      Count II(A), Plaintiffs' Breach of Fiduciary Duty Claim Must be Dismissed for Lack of Subject Matter Jurisdiction**

Ownership issues regarding patents are governed entirely by state law. *New Marshall Engine Co. v. Marshall Engine Co.,* 223 U.S. 473, 479 (1912); *Becher v. Contoure Laboratories,*

*Inc.*, 279 U.S. 388 (1929); *Jim Arnold Corporation, supra,* 109 F.3d at 1578; *Laning*, 125 F.2d at 567; *Lion Manufacturing*, 106 F.2d at 933. Thus, disputes over ownership of a patent confer no federal subject matter jurisdiction over this matter. *Id.* An ownership dispute must therefore be decided in state court prior to bringing a federal complaint under the patent laws. *Id.*

## VI.  Count II(b) (the Second Count II): Patent Infringement Claims Cannot Arise without Full Legal Title to the Patents and All Titleholders Joining the Suit

### A.  David Holds Legal Title to the Patents, and Thus can Block a Patent Infringement Claim

Any titleholder to a patent holds a full undivided interest in the patent, and may use the patent for any purpose. 35 USCA Sec. 261, 262. Any titleholder of the Patents may block a patent infringement claim, *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998*); DDB Technologies, LLC v. MLB Advanced Media, L.P.* 517 F.3d 1284, 1289 (Fed. Cir. 2008*); Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007). Thus, Plaintiffs must plead complete legal title <u>and plead facts showing that Plaintiffs have complete legal title</u> to the Patents, rather than David. *Crown Die & Tool C. v. Nye Toll & Machine Works,* 261 U.S. 24, 40-41 (1923); *Mymail v. America Online, Inc.*, 476 F.3d 1373, 1375 (Fed. Cir. 2007) ("A plaintiff must demonstrate legal title to the patent at the inception of the lawsuit to be entitled to sue for patent infringement."); *Jim Arnold Corporation v. Hydrotech Systems, Inc.* 109 F.3d 1567, 1571-1572 (Fed. Cir. 1997); *Laning v. National Ribbon & Carbon Paper Man. Co.,* 125 F.2d 565 (7th Cir. 1942); *Lion Manufacturing Corp. v. Chicago Flexible Shaft Co.,* 106 F.2d 930 (7th Cir. 1939). An equitable claim to title alone will not suffice to satisfy standing requirements for a patent infringement case. *Crown Die & Tool C. v. Nye Toll & Machine Works,* 261 U.S. 24, 40-41 (1923); *Gellman v. Tetular Corp.* 449 Fed. Appx. 941, 944 (Fed. Cir. 2011); *Laning,* 125 F.2d at 567 and *Lion Manufacturing*, 106 F.2d at 933. Plaintiffs have pleaded that they do not

8

have complete legal title to the Patents. Thus, the patent infringement case must be dismissed for lack of standing. (Second Amended Complaint ##42-47).

Plaintiffs do not have full legal title to the Patents as <u>legal title</u> vests only initially in the inventors as designated by the USPTO and then from express assignments or effective legal transfer effectuated in state court proceedings. *Arachnid, Inc. v. Merit Industries, Inc.,* 939 F.2d 1574, 1578, ftnte 2 (Fed. Cir. 1991); *Taylor v. Taylor Made Plastics, Inc.*, 2014 U.S. App. Lexis 8704 (Fed. Cir. 2014). Thus the patent infringement case must be dismissed, *Crown Die & Tool C. v. Nye Toll & Machine Works,* 261 U.S. 24, 40-41 (1923); *Mymail v. America Online, Inc.*, 476 F.3d 1373, 1375 (Fed. Cir. 2007); *Jim Arnold Corporation v. Hydrotech Systems, Inc.* 109 F.3d 1567, 1571-1572 (Fed. Cir. 1997). To quote the Federal Circuit in its most recent ruling on the subject in *Taylor v. Taylor Made Plastics, Inc.*, 2014 U.S.App. Lexis 8704 (Fed. Cir. 2014):

> The long-established rule is that a suit for patent infringement must join all co-owners of the patent as plaintiffs. *Waterman v. Mackenzie,* 138 U.S. 252, 255 (1891). If any co-owner should refuse to join as a co-plaintiff, the suit must be dismissed for lack of standing. *Id.*; *see also Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1468 (Fed. Cir. 1998). But a party is not co-owner of a patent for standing purposes merely because he or she holds an equitable interest in the patent. *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1578-82 (Fed. Cir. 1991). Rather, a co-owner must hold legal title to the patent. *Id.* at 1579 (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40-41 (1923)). Legal title vests initially in the inventor, and passes to others only through assignment or other effective legal transfer. *Id.* at 1578 n.2.

Plaintiffs have admitted that they do not have full legal title in the Patents as all inventors and/or express assignees of the inventors have not joined this lawsuit as plaintiffs (Second Amended Complaint ##42-47, See. Motion Exhibit #1, Affidavit of Tom Gough, #6, Ex. D to affidavit of Tom Gough, 2007 Assignment, 2008 Assignment). Plaintiffs have also made judicial admissions in previous pleadings that they do not have legal title to the Patents in their Motion for Temporary Restraining Order and Motion for Preliminary Injunction (Motion Exhibit #5, Pg. 3 of Motion for Preliminary Injunction and Motion Exhibit #4, Motion for Temporary Restraining Order). Without full legal title from all inventors or their registered assignees, Plaintiffs do not

have full ownership of the Patents, and their patent infringement suit must be dismissed for lack of standing. *Taylor v. Taylor Made Plastics, Inc., supra.*

## B. Plaintiffs' Claims of Patent Infringement are Barred Because Plaintiffs' Have No Claim to Equitable Title

For the reasons set out below, Plaintiffs have no equitable claim to the Patents. Even if the Court ignores nearly a century of precedent requiring all legal titleholders to join as plaintiffs to bring a patent infringement case, Plaintiffs have no equitable claim to David's legal title in the Patents and no basis for a patent infringement case against David.

Under Illinois law, only a clear and specific contract will compel assignment of patents from the inventor to his/her employer. *The Joliet Manufacturing Company v. Dice,* 105 Ill. 649 (1883), Here, express agreements establish exactly the opposite. Plaintiffs' claims for assignment of the Patents are barred by the SPA and express assignments. Plaintiffs plead two theories alleging an equitable claim to the Patents. Plaintiffs contend: (1) while an employee, David entered into an implied contract in fact under Illinois law vesting title in the Patents with III while David was an officer and director at III (Second Amended Complaint #44); and (2) David, as a corporate officer and director of III has and had a fiduciary duty to turn over a patent as a corporate opportunity (Second Amended Complaint #46).

However, an express agreement regarding ownership overrides any implied obligations to assign under an implied contract or common law principles. *The Joliet Manufacturing Company v. Dice, supra; Velsicol Corporation v. Hyman,* 338 Ill.App. 52, 88 N.E. 35, 37 (1949) *reversed on other grounds,* 405 Ill. 352; *In Re Stonecraft, LLC,* 322 B.R. 623, 630-631 (Bkrcy D. N. Miss. 2005). As such, Plaintiffs' claim for breach of fiduciary duty is barred.

## *ii.* All Implied Contracts Regarding Ownership are Barred by the Judicial Admissions of the Existence and Terms of the SPA, an Express Agreement

Plaintiffs claim that the implied contract arose while David worked at III (prior to signing the SPA). The SPA affirmed David and Gough individually owned the Patents in a recital clause of the SPA (which was incorporated in the Agreement) (Motion Exhibit #1, Plaintiffs' Ex B to Tom Gough affidavit and Motion for Temporary Restraining Order, SPA, pg. 1, Recital #2; Par. #1, Incorporation Clause). Recitals which are incorporated into a contract are binding terms of the contract. *Wilson v. Wilson,* 579 NE.2d 1323, 1329-1330, 217 Ill.App.3d 844 (1991). The recital is thus binding on III which was a party to the SPA (Motion Exhibit #1, Plaintiffs' Ex. B to the Motion for Temporary Restraining Order and Affidavit of Tom Gough, pg. 4, SPA, signature block). The SPA, an express contract, conclusively establishes the ownership of the Patents as of December 12, 2006. The SPA thus conclusively bars any implied contract as to ownership of the Patents while David was employed at III and as part of David's separation from III. *Velsicol Corporation v. Hyman,* 338 Ill.App. 52, 88 N.E. 35, 37 (1949) *reversed on other grounds,* 405 Ill. 352; *Sobel v. Franks,* 261 Ill.App.3d 670, 683 (1994); *Zadrozny v. City Colleges of Chicago,* 220 Ill.App.3d 290, 295 (1991*); Patterson v. Carbondale Community High School District No. 165,* 494 N.E.2d 240, 245; 144 Ill.App.3d 254 (1986); *see also Olesky v. General Electric Co.,* 2011 U.S. Dist. Lexis 54924 (N.D. Ill. 2011); *In Re Stonecraft, LLC,* 322 B.R. 623, 630-631 (Bkrcy D. N. Miss. 2005) (quoting and relying upon 3 Fletcher's Cylcopedia on Corporations Sec. 893, and American Intellectual Property Law Journal, 18 AIPLA Q.J. 127, 132 (1990)).

The SPA also contains an unambiguous merger clause as to all agreements and understandings prior to execution of the SPA (Motion Exhibit #1, Plaintiffs' Ex. B, to affidavit of Tom Gough and Motion for Temporary Restraining Order pg. 4, Par. 10(d)). Furthermore, the parties agreed the SPA was the complete agreement of the parties related to all matters in the SPA (including ownership of the Patents) (*id*). Under Illinois' doctrine of merger and bar and the parol

evidence rule, the SPA's merger clause bars any implied contract regarding ownership of the Patents arising from David's employment. *Magnus v. Lutheran General Healthcare System,* 235 Ill.App.3d 173, 601 N.E.2d 907, 914-915 (1992). Thus, any claim of an implied contract arising from David's employment is barred by the SPA's merger clause.

Finally, the SPA contains a release clause wherein III released David from any and all rights and causes of action and <u>released David from any claim on his assets by III</u>. The ownership of the Patents was known at the time of the SPA (and addressed in the SPA and assignments). Therefore, the release eliminated all rights regarding ownership of the patents other than those in the assignments (executed after the release clause) and the SPA. *Farm Credit Bank of St. Louis v. Whitlock,* 581 N.E.2d 664, 667; 144 Ill.2d 440 (1991).

### *iii.*     The SPA Bars any Fiduciary Duty Claim Regarding Corporate Opportunities

An officer is only usurping a corporate opportunity if he/she takes advantage of that opportunity without the corporation's consent. *In Re Stonecraft, LLC,* 322 B.R. 623, 630-631 (Bkrcy D. N. Miss. 2005) quoting and relying upon 3 <u>Fletcher's Cyclopedia on Corporations</u> Sec. 893, and <u>American Intellectual Property Law Journal,</u> 18 AIPLA Q.J. 127, 132 (1990). A fiduciary only has to disclose an opportunity to the corporation and obtain corporate consent before taking advantage of the opportunity. *Dremco, Inc. v. South Garden Chapel Hills, Inc.,* 274 Ill.App.3d 534, 654 N.E.2d 501, 505 (1995); *Levi v. Markal Sales Corp.,* 268 Ill.App.3d 355, 643 N.E.2d 1206, 1215 (1994). Thus, an express agreement affirming ownership of a patent bars a fiduciary duty claim for assignment of patents. *Velsicol Corporation v. Hyman,* 338 Ill.App. 52, 88 N.E. 35, 41-42 (1949) *reversed on other grounds,* 405 Ill. 352.

Here, the SPA shows there was full disclosure of the issue of ownership of the Patents and corporate consent as to David's ownership after he left III. There was a recital stating David

individually owned the Patents; incorporation of the recital making it binding on III; a release of all claims and all assets (including David's right to the Patents); and a merger and bar of all previous agreements and understandings related to the Patents. The SPA demonstrates disclosure by David of the issue of ownership of the Patents and a binding contractual consent to David's ownership of the Patents in the SPA.

*iv.*    **Judicial Admissions Regarding the Assignments Bar Any Claim to the Patents**

Just as the SPA constitutes an express agreement barring an implied claim to ownership in the Patents, so the 2007 and 2008 Assignments constitute express agreements barring implied obligations, including implied or equitable claims to ownership. *In Re Access Cardiosystems, Inc.* 340 B.R. 127, 151-152, 2006 Bankr. Lexis 486 (D. Mass. 2006); *See also Sobel v. Franks*, 261 Ill.App.3d 670, 683 (1994); *Zadrozny v. City Colleges of Chicago*, 220 Ill.App.3d 290, 295 (1991); *Premier Electric Construction Co. v. LaSalle National Bank*, 132 Ill.App.3d 485, 496 (1985); *Olesky v. General Electric Co.,* 2011 U.S. Dist. Lexis 54924 (N.D. Ill. 2011). The assignments to Pacholok after he left III, signed by Tom Gough (III's president and sole remaining shareholder after David left III), constitute an express agreement barring any implied obligations to assign the Patents.

Moreover, a party who assigns a patent cannot challenge the validity of the assigned patent against the assignee. *Mentor Graphics Corporation v. Quickturn Design Systems, Inc.* 150 F.3d 1374, 1377-1378 (Fed. Cir. 1998); *Q.G. Products, Inc. v. Shorty, Inc.,* 992 F.2d 1211, 1212-1215 (Fed. Cir. 1993); *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). An assignor cannot claim that assignments to an assignee are nullities in subsequent litigation with the assignee. *Id.* Assignor estoppel applies to those in privity with assignors. *Diamond Scientific Co.,* 848 F.2d at 1225. Assignor estoppel is a form of legal estoppel preventing the assignor or its

privies from challenging any statement in the assignments. *Id.* At 1225.

The affidavit of Tom Gough demonstrates he was the president of III from its inception to the present (Motion Exhibit #1, Affidavit of Tom Gough, #2, 3). The affidavit of Tom Gough authenticated the assignments and demonstrates that Gough executed the assignments (Motion Exhibit #1, Affidavit of Tom Gough, #6). Tom Gough was the sole remaining stockholder after David left III (Motion Exhibit #1, Exhibit B, SPA, Recital #1). Tom Gough was also the President and Manager of Induction Holding Company, LLC ("IHC") when he executed the assignment of the Patents to David (Motion Exhibit #1, Affidavit of Tom Gough, #2,5,6 Exhibit D). Gough admitted IHC was a holding company for III for the Patents (Affidavit of Tom Gough, 6). III, Tom Gough, and IHC are all in privity and barred from challenging the assignments which Tom Gough signed individually and as president of IHC.

## VIII.   Count II(b); Count III; Count IV: This Court has No Supplemental Jurisdiction over the State Law Claims as They Do Not Arise out of the Same Transaction or Occurrence as the Federal Claims

If the Court finds there is no federal subject matter of the federal counts under the patent laws, there is no supplemental jurisdiction over state law claims. *Larson v. Correct Craft, Inc.* 569 F.3d 1319, 1326 (Fed. Cir. 2009). Thus, if the federal claims are dismissed, the state law claims must be dismissed for lack of subject matter jurisdiction. *Id.*

Moreover, Plaintiffs' claims of inventorship are completely unrelated to the state claims (ownership of the Patents after David left III; claims that David has claimed to be affiliated with III after he left III; and David's right to payments for products produced by III). *Clark v. B.H. Holland Co., Inc.* 86 F.3d 1178 (Fed. Cir. 1996). Inventorship disputes do not arise out of the same nucleus of operative facts as claims of corporate malfeasance by a shareholder and officer. *Id.* Similarly, patent infringement claims (should they survive) are not factually related to two of

the three state law counts. *Highway Equipment Company, Inc. v. FECO, Ltd.* 469 F.3d 1027, 1037-1039 (Fed. Cir. 2006).

Specifically, the inventorship declaratory judgment action requires evidence as to whether David or Gough contributed to the claims in the Patents. The patent infringement case requires evidence that David used the Patents personally and/or that he induced the production of a patented good by a competitor of III after David left III. The state law claims (except for the patent ownership claim and patent infringement claim) arise from a completely different nucleus of operative facts as the inventorship claims and patent infringement claims. The declaratory judgment claim for contract interpretation concerns the meaning of a contract for payments due to David under the contract regardless of ownership of the Patents. The intentional interference with business relationship claim arises from allegations of David claiming he was affiliating himself with III after separation. The breach of fiduciary duty claim arises from allegations related to David's employment at III and David's separation from III. Thus, even if some of Plaintiffs' federal claims survive, the state law claims must be dismissed. *Highway Equipment Company, Inc. v. FECO, Ltd.* 469 F.3d 1027, 1037-1039 (Fed. Cir. 2006)

## VI. CONCLUSION

For the above reasons, Pacholok respectfully requests this Court enter an order granting his FRCP Rule 12(b)(1) motion, and dismiss this Case for lack of subject matter jurisdiction.

Dated: July 3, 2014

Respectfully Submitted,
David Pacholok
By: /s/ Joseph P. Selbka
    Michael Martin-Johnston #6286805
    Joseph P. Selbka #6238063
    Attorneys for Defendant
    Waltz, Palmer & Dawson, LLC
    3701 Algonquin Rd., Suite 390
    Rolling Meadows, Illinois 60008
    (847) 253-8800

# EXHIBIT 1



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

INDUCTION INNOVATIONS, INC., and          )
SARGE HOLDINGS COMPANY, LLC,               )
                              Plaintiffs,   )       Case No.
                                            )
v.                                          )       Judge Amy St. Eve
                                            )
DAVID PACHOLOK,                             )
                              Defendant.    )

## DECLARATION OF THOMAS GOUGH

I, Thomas Gough, declare as follows:

1.      I am over 21 years of age and have personal knowledge and am competent to testify to the following.

2.      I have been the President of Induction Innovations, Inc. ("Induction") since its formal incorporation on November 30, 2000.

3.      David Pacholok and I started Induction together. He and I were co-owners of Induction; each of us owned 50% of its stock. He was the Secretary of Induction when we formed it and I was the President (Exhibit A). Mr. Pacholok and I first met as firefighters in 1993. When I discovered that Mr. Pacholok had induction heating expertise, we began to discuss its capabilities. I began to experiment with a prototype induction heater given to me by Mr. Pacholok in 1999. I had over 24 years automotive/collision repair expertise which Mr. Pacholok did not, and I first recognized that induction heating could be used to remove items such as bolts, glass, body trim and other parts bonded to vehicles, which could be very useful to automotive workers in "body shops" and similar businesses. I discussed my ideas for applying induction heating in this fashion with Mr. Pacholok, and he was very interested. In about late 1999 and

1

early 2000, we began discussions to start a company to leverage this invention, and we also discussed filing for a patent application as co-inventors.

4.      In 2000-2006, Induction developed, marketed and sold induction heater products and accessories falling within the scope of the claims of U.S. Patent Nos. 6,563,096 and 6,670,590 ("Induction's Patents"), including the Mini-Ductor® the Inductor® Max, and the GlassBlaster®. Induction's Patents cover induction heater products which are central and essential to Induction's business.

5.      Mr. Pacholok resigned from Induction in August, 2006, pursuant to a written "Stock Purchase Agreement" ("the "SPA," Exhibit B). The SPA says nothing about who owns Induction's Patents.

6.      Mr. Pacholok represented to clients, potential investors, and others that the Patents were owned by Induction and were company assets (e.g., Exhibit C). After Mr. Pacholok left Induction, we executed documents assigning Induction's Patents to a holding company, solely for the limited purpose of facilitating patent litigation with Ajax Tocco (Exhibit D). After the litigation ended, the Patents were assigned back to me and Mr. Pacholok (id.). This was done for convenience in the patent litigation, and there was no consideration or understanding given to what parties or entities actually owned the Patents as concerned Induction, myself and Pacholok.

7.      In October of 2006, in preparing to enforce the Patents against a third party in the industry, Ajax Tocco, Mr. Pacholok and myself reviewed calendars and prepared time lines of events, showing that from at least 10/99-10/30/00 we were working on the "induction project" which included "Induction idea notes" (1/02/00), "Induction uses list (notes)" (2/2/00), drawings of various induction tools "Flameless" and "Odyssey" (May and July, 2000), and an Order for electrical service for Induction's booth at the NACE trade show (10/30/00) (Exhibit E). As of

2

11/20/2000, "Induction Innovations, Inc." had an "Exhibitor Listing" at the NACE 2000 trade show (Exhibit F).

8.      Induction paid for designing, developing, tooling and marketing the induction heater technology which is the subject of Induction's Patents. Induction also paid for the patent agent and filing fees necessary to procure Induction's Patents, and Induction has paid for and continues to pay for the maintenance fees necessary to keep the Patents alive. For example, an Induction corporate document (Exhibit G) indicates that Mr. Pacholok was to be reimbursed $5200 for his investment in Induction as of 4/1/02; this did, in fact, occur (see Induction check written to David R. Pacholok for $5200, with a note for "Loan Repayment," Exhibit H), and these reimbursed funds included reimbursement for costs relating to prosecution of the Patents.

9.      In my view, Mr. Pacholok unfairly took advantage of a corporate opportunity by asserting control over the Induction Patents, and purporting to license them to a direct competitor of Induction's, Lace Technologies, Inc. This resulted in Induction encountering direct competition from Lace's induction heater, known as the BoltBuster, and also required Induction to spend many thousands of dollars in attorney fees and costs in its lawsuit with Lace.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   July 17, 2013

Thomas M. Gough

3

# EXHIBIT A



7/11/13                          CORP/LLC - File Detail Report



## CORPORATION FILE DETAIL REPORT

| Entity Name | INDUCTION INNOVATIONS, INC. | File Number | 61348638 |
|---|---|---|---|
| Status | ACTIVE | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 11/30/2000 | State | ILLINOIS |
| Agent Name | JOEL N GOLDBLATT | Agent Change Date | 01/14/2013 |
| Agent Street Address | 221 N LASALLE ST STE 3700 | President Name & Address | THOMAS M GOUGH 583 RUNNING DEER LN GILBERTS IL 60136 |
| Agent City | CHICAGO | Secretary Name & Address | SAME |
| Agent Zip | 60601 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 10/26/2012 | For Year | 2012 |

Return to the Search Screen

Purchase Certificate of Good Standing

(One Certificate per Transaction)

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

7/11/13                                     CORP/LLC - File Detail Report

**Form SS-4**
(Rev. December 1993)
Department of the Treasury
Internal Revenue Service

## Application for Employer Identification Number

(For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, certain individuals, and others. See instructions.)

EIN 36-4421169

OMB No. 1545-0003
Expires 12-31-96

Please type or print clearly.

**1** Name of applicant (Legal name) (See instructions.)
Induction Innovations, Inc

**2** Trade name of business, if different from name in line 1

**3** Executor, trustee, "care of" name

**4a** Mailing address (street address) (room, apt., or suite no.)
1815 W. Main St

**5a** Business address, if different from address in lines 4a and 4b

**4b** City, state, and ZIP code
Dundee, IL 60118

**5b** City, state, and ZIP code

**6** County and state where principal business is located
Kane County, Illinois

**7** Name of principal officer, general partner, grantor, owner, or trustor—SSN required (See instructions.) ▶
David Pacholok    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

**8a** Type of entity (Check only one box.) (See instructions.)
- [ ] Sole Proprietor (SSN) _____
- [ ] REMIC          [ ] Personal service corp.
- [ ] State/local government   [ ] National guard
- [ ] Other nonprofit organization (specify) _____
- [ ] Other (specify) ▶
- [ ] Estate (SSN of decedent) _____
- [ ] Plan administrator-SSN _____
- [x] Other corporation (specify)  Sub S
- [ ] Federal government/military
- [ ] Trust
- [ ] Partnership
- [ ] Farmers' cooperative
- [ ] Church or church controlled organization
      _____ (enter GEN if applicable) _____

**8b** If a corporation, name the state or foreign country (if applicable) where incorporated ▶
State  Illinois
Foreign country

RECEIVED
JAN 0 2 201

**9** Reason for applying (Check only one box.)
- [x] Started new business (specify) ▶ _____
- [ ] Hired employees
- [ ] Created a pension plan (specify type) ▶
- [ ] Banking purpose (specify) ▶
- [ ] Changed type of organization (specify) ▶ _____
- [ ] Purchased going business
- [ ] Created a trust (specify) ▶ _____
- [ ] Other (specify) ▶

**10** Date business started or acquired (Mo., day, year) (See instructions.)
11/30/00

**11** Enter closing month of accounting year. (See instructions.)
12/01

**12** First date wages or annuities were paid or will be paid (Mo., day, year). Note: If applicant is a withholding agent, enter date income will first be paid to nonresident alien. (Mo., day, year) . . . . . . . . . . . . ▶   2/01/01

**13** Enter highest number of employees expected in the next 12 months. Note: If the applicant does not expect to have any employees during the period, enter "0." . . . . . . ▶

| Nonagricultural | Agricultural | Household |
|---|---|---|
| 0 | 0 | 0 |

**14** Principal activity (See instructions.) ▶ Research

**15** Is the principal business activity manufacturing? . . . . . . . . . . . . . [ ] Yes [x] No
If "Yes," principal product and raw material used ▶

**16** To whom are most of the products or services sold? Please check the appropriate box.   [ ] Business (wholesale)
[ ] Public (retail)    [ ] Other (specify) ▶                                    [x] N/A

**17a** Has the applicant ever applied for an identification number for this or any other business? . . . . . . . [ ] Yes [x] No
Note: If "Yes," please complete lines 17b and 17c.

**17b** If you checked the "Yes" box in line 17a, give applicant's legal name and trade name shown on prior application.
Legal name ▶                         Trade name ▶

**17c** Enter approximate date, city, and state where the application was filed and the previous employer identification number if known.
Approximate date when filed (Mo., day, year)  City and state where filed     Previous EIN

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Business telephone number (include area code)
847-658-7711
FAX 847-658-6115

Name and title (Please type or print clearly.) ▶

Signature ▶                                    Date ▶ 1-8-2001

Note: Do not write below this line.    For official use only.

| Please leave blank ▶ | Geo. | Ind. | Class | Size | Reason for applying |
|---|---|---|---|---|---|
| | | | | | |

For Paperwork Reduction Act Notice, see attached instructions.        Cat. No. 16055N        Form **SS-4** (Rev. 12-93)

FEB/16/2010/TUE 06:50 PM   WARD LANE AND ASSOC.      FAX No. 8477427352              P. 004

File #  D 6134-863-8

Form **BCA-5.10**

**NFP-105.10**

(Rev. Jan. 1989)

Jesse White
Secretary of State
Department of Business Services
Springfield, IL 62756
Telephone (217) 782-3847
http://www.sos.state.il.us

**STATEMENT OF CHANGE OF REGISTERED AGENT AND/OR REGISTERED OFFICE**

Jesse White Secretary of State

FILED DATE 7/31/2002

CP06586T5

Type or print in black ink only.
See reverse side for signature(s).

SUBMIT IN DUPLICATE

This space for use by Secretary of State

Date    FILED DATE 7/31/2002

Filing Fee    $ 5

Approved:    CLD

Remit payment in check or money order, payable to "Secretary of State."

1.   CORPORATE NAME:  INDUCTION INNOVATIONS, INC.

2.   STATE OR COUNTRY OF INCORPORATION:  ILLINOIS

3.   Name and address of the registered agent and registered office as they appear on the records of the office of the Secretary of State *(before change)* :

| Registered Agent | TERRY | D | KOVAC |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Registered Office | 1972 | LARKIN AVENUE | |
| | Number | Street | Suite No. (A P.O. Box alone is not acceptable) |
| | ELGIN | IL | 60123 | KANE |
| | City | | ZIP Code | County |

4.   Name and address of the registered agent and registered office shall be *(after all changes herein reported)*:

| Registered Agent | DENNIS | N | WARD |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Registered Office | 1250 | LARKIN AVENUE  #200 | |
| | Number | Street | Suite No. (A P.O. Box alone is not acceptable) |
| | ELGIN | IL | 60123 | 045 |
| | City | | ZIP Code | County |

FEB/16/2010/TUE 06:50 PM   WARD LANE AND ASSOC.      FAX No. 8477427352           P. 005

5.   The address of the registered office and the address of the business office of the registered agent, as changed, will be identical.

6.   The above change was authorized by: ("X" one box only)
     a.  ☒ By resolution duly adopted by the board of directors.        (Note 5)
     b.  ☐ By action of the registered agent.                           (Note 6)

NOTE: When the registered agent changes, the signatures of both president and secretary are required.

7.   (If authorized by the board of directors, sign here. See Note 5)
     The undersigned corporation has caused this statement to be signed by its duly authorized officers, each of whom affirms, under penalties of perjury, that the facts stated herein are true.

Dated    JULY 19, 2002                          INDUCTION INNOVATIONS, INC.
         (Month & Day)        (Year)            (Exact Name of Corporation)      7/22/02

attested by _____ 7-22-02          _____
            (Signature of Secretary or Assistant Secretary)    (Signature of President or Vice President)
            DAVID PACHOLOK, SECRETARY          THOMAS GOUGH, PRESIDENT

            (Type or Print Name and Title)     (Type or Print Name and Title)

(If change of registered office by registered agent, sign here. See Note 6)
     The undersigned, under penalties of perjury, affirms that the facts stated herein are true.

Dated _____   _____   _____
            (Month & Day)           (Year)     (Signature of Registered Agent of Record)


## NOTES

1.   The registered office may, but need not, be the same as the principal office of the corporation. However, the registered office and the office address of the registered agent must be the same.

2.   The registered office must include a street or road address; a post office box number alone is not acceptable.

3.   A corporation cannot act as its own registered agent.

4.   If the registered office is changed from one county to another, then the corporation must file with the recorder of deeds of the new county a certified copy of the articles of incorporation and a certified copy of the statement of change of registered office. Such certified copies may be obtained ONLY from the Secretary of State.

5.   Any change of registered agent must be by resolution adopted by the board of directors. This statement must then be signed by the president (or vice-president) and by the secretary (or an assistant secretary).

6.   The registered agent may report a change of the registered office of the corporation for which he or she is registered agent. When the agent reports such a change, this statement must be signed by the registered agent.

C-135.12

The chairman of the meeting stated that it was in order for the shareholders to fix the number of initial directors and to elect initial directors to hold office until the first annual meeting of shareholders or until their respective successors shall be elected and shall have qualified. Thereupon the number of initial directors was fixed at two, and the following persons were nominated for directors of the corporation to serve until the next annual meeting of shareholders or until their respective successors are elected and qualified:

1.   David Pacholok

2.   Thomas Gough

No further nominations being made, the nominations were closed and the shareholders proceeded to vote on the nominees. The vote having been taken and counted, the nominees were elected.

There being no further or other business to come before the meeting, on motion duly made, seconded and carried, the meeting adjourned.

Thomas Gough
Secretary of the Meeting

WP6.0: induct1.for
10/1/01

2

## MINUTES OF FIRST MEETING OF
## SHAREHOLDERS

The first meeting of the shareholders of INDUCTION INNOVATIONS, INC., an Illinois corporation, was held on September 27, 2001, pursuant to call by the incorporators.

Upon motion duly made, seconded and unanimously carried, David Pacholok was chosen as chairman of the meeting and Thomas Gough was chosen as secretary of the meeting.

The following shareholders were present in person:

| Name | Number of Shares |
|------|------------------|
| 1.   David Pacholok | 500 |
| 2.   Thomas Gough | 500 |

The secretary reported that all the shareholders of the corporation were present in person.

The chairman reported that the Secretary of State of Illinois had filed the Articles of Incorporation of the corporation in his office, and had issued a certificate of incorporation on said date.

The subscription agreements, if any, covering all existing subscriptions to the shares of the corporation were accepted. It was noted that the Articles of Incorporation of the corporation were filed in the office of the Recorder of Deeds of KEYBOARD() County.

On motion duly made, seconded and unanimously carried, it was

RESOLVED that the subscription agreement covering all existing subscriptions to shares of this corporation be and the same is hereby approved;

FURTHER RESOLVED that the articles of incorporation of this corporation as filed in the office of the Secretary of State be and the same are hereby approved;

The chairman of the meeting stated that it was in order for the shareholders to fix the number of initial directors and to elect initial directors to hold office until the first annual meeting of shareholders or until their respective successors shall be elected and shall have qualified. Thereupon the number of initial directors was fixed at two, and the following persons were nominated for directors of the corporation to serve until the next annual meeting of shareholders or until their respective successors are elected and qualified:

1.  David Pacholok

2.  Thomas Gough

No further nominations being made, the nominations were closed and the shareholders proceeded to vote on the nominees. The vote having been taken and counted, the nominees were elected.

There being no further or other business to come before the meeting, on motion duly made, seconded and carried, the meeting adjourned.

Thomas Gough
Secretary of the Meeting

WP8.0: Induct1.rtf
10/1/01

2



Atlas Corporate & Notary Supply Co., P.O. Box 1638, Skokie, IL 60076 (800) 833-7325





Atlas Corporate & Notary Supply Co., P.O. Box 1638, Skokie, IL 60076 (800) 833-7325

ATLAS CORPORATE & NOTARY SUPPLY CO.
8107 RIDGEWAY AVENUE
P. O. BOX 1638
SKOKIE, ILLINOIS 60076
(800) 833-7325

(ADHERE CANCELLED STOCK CERTIFICATE IN THIS SPACE)

Certificate Number ___2___ For __500__ Shares

Issued to __David Bachelor__

Dated __1/24/01__

Received this Certificate _____

Surrendered this Certificate _____

TRANSFER FROM ORIGINAL ISSUE BELOW

From Whom Transferred: _____

| ORIGINAL CERTIFICATE | | NUMBER OF ORIGINAL SHARES | NUMBER OF SHARES TRANSFERRED |
|---|---|---|---|
| NUMBER | DATE | | |
| | | | |

TRANSFER DETAILS FOR SURRENDERED CERTIFICATES

New Certificate Issued to: _____

| NUMBER OF NEW CERTIFICATES | NUMBER OF SHARES TRANSFERRED |
|---|---|
| | |

ATLAS CORPORATE & NOTARY SUPPLY CO.
8107 RIDGEWAY AVENUE
P. O. BOX 1638
SKOKIE, ILLINOIS 60076
(800) 833-7325

(ADHERE CANCELLED STOCK CERTIFICATE IN THIS SPACE)

Certificate Number _____ 1 _____

Issued to _____ Thomas Brugh _____

_____ For _____ 500 _____ Shares

Dated _____ 4/29/01 _____

Received this Certificate _____

Surrendered this Certificate _____

TRANSFER FROM ORIGINAL ISSUE BELOW

| | ORIGINAL CERTIFICATE | | NUMBER OF ORIGINAL SHARES | NUMBER OF SHARES TRANSFERRED |
|---|---|---|---|---|
| From Whom Transferred: | NUMBER | DATE | | |
| | | | | |
| | | | | |
| | | | | |

TRANSFER DETAILS FOR SURRENDERED CERTIFICATES

| New Certificate Issued to: | NUMBER OF NEW CERTIFICATES | NUMBER OF SHARES TRANSFERRED |
|---|---|---|
| | | |
| | | |
| | | |

# EXHIBIT B to be filed under seal upon entry of an order



# EXHIBIT C



Main : tomg@inductioninnovations.com



Home | In-Box | Compose | Address Book                    HELP?

tomg@inductioninnovations.com                    Folders | Options | Search

# In-Box                                                    Sign Out

**Folders** [Hide]     ALL |          **Reply** | Reply All |     Delete    Move To: ▾   Printable Version
                       Next          Forward                     |

- In-Box (4 new)
- Deleted            FROM:  "Dave Pacholok" <davep@çecone.com> | Save Address
- Draft              DATE:  Sun, 25 Jan 2004 22:05:42 -0600
- Sent (1 new)       TO:    <RonScribe@aol.com>
                     SUBJECT: a few MORE words about IP

[Manage Folders]     Dear Mr. Schneiderman:
                     I enjoyed your recent cover feature "Don't get ensnared by design's Legal Issues". Your section about
                     IP was particularly appreciated but I'd like to tell you a story about another legal trap that can ensnari
                     the little guy. There once was a small startup company that DID the due diligence, checked for prior
                     art, and then filed for patents (which by the way, were granted) and merrily went out and manufactured
                     and sold their products. All went well for a few years (the partners quit their jobs to work full time for
                     their co.) until one day they noticed that a rather large American company was selling EXACT
                     CLONES of their product. When they approached the other company they were told that patents really
                     don't mean much nowadays. Consternated, and feeling somewhat violated, the good partners went to
                     a number of better Attorneys for even better advice. The advice and consul therefrom was of two
                     flavors:
                     1. Getting justice by injunctive or other legal tactics could take years and cost up to $2,000,000.00 or
                     even more, if a COUNTERSUIT (frivolous or not) is launched.
                     2. Don't waste time and $$$ on a suit until Real Harm has been done to the business, and it can be
                     proven so there will be something to sue for.
                     Now the good partners came up a little short of the needed 2 million and their better lawyers showed
                     them the door, leaving them to wonder how they would ever get the money to buy the justice they
                     needed while Real Harm was slowly done to their source of income.
                     The moral of the story? Don't expect justice if you can't pay for it! Like it or not that is what our system
                     has evolved (or devolved) into! And they say all the countries on our fair planet are even worse...

                     David Pacholok/CEC

                     P.S. Thanks for your time and consideration

                     ALL |          **Reply** | Reply All |     Delete    Move To: ▾   Printable Version
                     Next           Forward                     |

©2002 Doteasy Technology Inc. All rights reserved.

 **CREATIVE ELECTRONICS CONSULTANTS**

Mr. Donald Schumacher
President/CEO
Schumacher Electric Corp.
801 Business Center Drive
Mt. Prospect, IL 60056

Dear Mr. Schumacher:

As we both know, obtaining justice from the Federal Courts during U. S. Patent litigation can be an expensive farce. As an engineer and businessman I know that the outcome for Schumacher should have been far different for you last year. But that is "water over the dam".

At this point in time, my other company, Induction Innovations Inc. (www.the inductor.com) has endured the infringement of our patents 6,563,096 and 6,670,590 by Ajax-Tocco Inc., a subsidiary of Park Ohio (PKOH) for 3 years. We sent the usual letters through our attorney Michael Mazza Esq. including offering a licensing arrangement under these patents to no avail. Our attorney's read on the situation is that they feel they have nothing to fear from us as we are a small company with only about $1M/year in gross sales and couldn't possibly carry through with a creditable threat of litigation. As to the contingency option, every lawyer we contacted from Nero-Scavoni on down will only take on contingency fee cases when the damages are at least $5 Million. Our damages at this point are about one-half this figure. Unfortunately, due to the time limits imposed by Latches and Estoppels we cannot wait much longer for damages to accumulate.

I therefore offer you the following proposition, which involves your cooperation in a bit of a ruse! In short, if our infringer could be made to believe that Schumacher Electric Dollars were behind us there is a good chance that we could get them to negotiate a settlement as without spending huge sums of time and money. They are no Vector; Ajax-Tocco is a long-suffering industrial induction heating equipment supplier in our increasingly deindustrialized heartland. Their risking $1.5 Million or more in litigation costs let alone damages is just not economically viable.

As to a means to convince them of your backing one possibility is to issue a Press Release such as: "Schumacher Electric announced today the conclusion of successful negotiations for the acquisition of an equity stake (controlling interest?) in Induction Innovations Incorporated of Gilberts IL, a manufacturer of automotive repair induction heating systems. Schumacher, the leading manufacturer of automotive chargers and welders looks forward to entering yet another expanding automotive market by this acquisition." Induction Innovations would then issue a corresponding Press Release to reinforce the idea.

In return for your assistance we hereby offer you 1/3 (one third) of any settlement that we receive from Ajax-Tocco. Don, you have been very generous with my other company, CEC over the years. Nothing would give me greater pleasure than putting some real money back in your pocket while getting these parasites off our back.

Sincerely,

*David R. Pacholok*  JUNE 14, 2006

David R. Pacholok

NOTE:

Induction Innovations Inc.                          June 27, 2001
1815 West Main St.
West Dundee Illinois 60118

Rick Hrdlicka
Pro Motorcar Products Inc.
36400 Woodward Ave.
Bloomfield Hills Mi. 48304

Attn: Rick Hrdlicka

Dear Rick:

It was great to hear from you again!  No problem with the delay,
we are all with "too many irons in the fire" these days as they
say.  Dave and I have been discussing your letter and  while we
are in general agreement with most of the possibilities you
described in your letter of June 26 we would like you to define
and expand upon for us some of the following issues:

1. Do you have a specific marketing plan for our product line?

2. If so could you share some of the details with us?

3. We have no problem with a 3-year commitment giving you
exclusive marketing rights (with renewal options to be
negotiated), however, we would like to see certain minimum yearly
sales quotas met in order to maintain your exclusivity.  We
propose 1000 units for year one, 2500 units for year two, and
5000 units for succeeding years.  The foregoing is based upon our
present product line of four distinct but related products, the
Inductor 2000, the FastOff, the Concentrator, and the Glass
Blaster, not to include RemoteCheck and derivative products.  In
turn, we would expect you to expect us to be able to meet the
above sales figures with Production Units in a timely fashion,
based upon your quarterly sales projections.

4. We would like to have a better definition of "financing" as
used in paragraph 5 of your letter, as well as a better
understanding of all items in this paragraph such as:
If a large order is placed by Co. XYZ and they repeatedly
"forget" to pay their bill who absorbs the loss/collection/court
costs/atty. fees etc. ad nauseam?

5. Product Labeling and Design Modifications:  If we understood
our conversations during our meeting correctly, you would like to
take over the product labeling which is fine with us.

However, the issue of product modifications and partial redesign
has already arisen with Daryl at D.C. While we would not of
course charge for engineering for something as trivial as
increasing cord length, at some point we need to recoup our
engineering costs.

6.Will you also be needing our services as consultants or
training personnel? If so we will need to determine compensation.

These are just a few of the issues we believe we need to address
and we are sure you have more of your own. We think it would be
beneficial to all parties involved if we sat down together and
ironed these details out. None of this is carved in stone but we
do need to start somewhere.

With regard to the other option you tabled re. a total buy-out of
III we really do not feel that at this point that any of the
standard "rules of thumb" for fair valuation of a business
enterprise based upon annual gross sales, net profit, etc. etc.
as suggested by our accountant or attorneys would really be
applicable here. In essence, our future patent position (if all
goes as we expect) should allow a virtual lock on a new market
whose potential has only just begun to be tapped. This considers
only the 60,000 or so U.S. body shops not to mention mechanical
repair facilities (100K or so in the U.S. for cars alone) and
other unknown applications. However, if a total buy out is
desired at this point, what more can we say than make us an offer
based upon an honest appraisal of the above as if you were in our
position.

We believe that our coming together on this represents a unique
opportunity for all concerned and hope that we can do our part to
help each other to achieve our aspirations.

Sincerely,


Thomas M. Gough


President
Induction Innovations Incorporated

*Ron — waddya think ?*

*Not*

Mr. Rick Hrdlicka                                    July 20, 2001
Mr. Garrett Morelock
Promotorcar Inc.
36400 Woodward Ave.
Bloomfield Hills MI

Dear Rick and Garrett:

Thank you for your proposal.  I think we are moving in the right
direction here with 3 Minor exceptions.  We propose that we
retain responsibility for manufacturing our products and will use
best efforts to reduce our cost to you as you naturally increase
sales volume.  To this end, we have transfered all necessary
materials and information to our contract manufacturing house in
order to obtain **solid quotes** for you in quantities of 250, 500,
1K and 2.5K lots.  These prices will be available on or about
7-25, and estimated delivery times for the various quantities to
follow later.

In order to maintain your exclusive distrubitorship, we need to
have guaranteed the following quantities per period:
First 12 months, 500 units; Second 12 months, 1500 units; and
2500 units the third 12 month period.  We would like to have a
quarterly order quantity placed at the beginning of each quarter;
following our delivery of the quantity ordered, we will bill and
expect payment with terms of NET 30 from actual delivery date.
We would also need you to allow us to become your exclusive
manufacturer for our current products and any derrivitive
products, irrespective of any patents covering these product(s)
being issued or not.  If, however, III should consistently
default on delivery of product orders, we are willing to allow
the above exclusivity to be temporarly waived until our delivery
problems have been corrected.

With respect to your pricing strategy, We appreciate your candor
with us, but respectfully make the following comments:

1. While we are no marketing wizzards, we feel that our $750
retail price point is pushing the limit of what the smaller shops
will bear (they have told us this!).  We therefore feel that a
$1000 tag will severely limit sales.

2. We remind you that connectorizing the unit adds considerable
cost, and while it improves convience of tool use for some users
some of the time why not give the the customer the **choice** of
**convienence** or the **lowest possible price?**

This strategy seems to have worked out well for the BIG 3 when selling their products.
Removing this choice and thereby raising the price across the board seems like the wrong direction.

3. Please be aware that in the TWO YEARS we have been developing this product we have thought of and set aside numerous options such as tooled cases, connectorization, various adaptors, etc. etc. If you wish any other changes in our basic products please advise us so that we can assess the engineering and manufacturing impact beforehand. Any product changes will, of course, incur a modest engineering fee, as well as possible tooling costs.

4. Tom having been in the auto body repair industry for over 27 years at shops large and small, union and non-union, as a body technician as well as a manager has a *unique insider's knowledge* and wide perspective of the **autobody repair industry,** much as you have a unique perspective on the needs of the **auto manufacturing paint and related OEM industries.** Tom is also a purchaser and user of tools and converses with countless other tool users in his daily profession. Maybe we are talking two markets here?!

If you however are uncomfortable with some of our proposals maybe it would be best to wait for our patent to issue so that you may possibly have the option of purchasing the technology and/or rights to manufacture, which seems to be of greatest interest to your commmpany.

Sincerely,


David R. Pacholok

6-12-04 SAT 13:57 C.E.C.                                                    P.01

Mr. Richard Martinez                                        June 12, 2004
The Martinez Group
1175 Alexander Court
Cary, Illinois 60013

Dear Mr. Martinez:

This letter is written in response to your expressed desire to play a more significant role in the future of our company, Induction Innovations Incorporated (hereinafter III), than merely that of a contract assembly house. Tom and I have discussed and deliberated the various possibilities of greater involvement with Martinez numerous times over the past two months and feel that the following plan would meet all parties' objectives while minimizing the risk and unnecessary capital expenditure for all:

1. We would retain our core business, that is to say our direct and distributor sales to Auto Body, Auto Salvage, and Auto Glass aftermarket entities.
2. Martinez would have exclusive license to market the current Inductor Product Line to all OEM markets within the above areas.
3. Martinez would also have exclusive license to market derivative Inductor Products as they see fit, within all markets of their choosing.
4. Martinez farther would have the right to market derivative Inductor Applications within all markets of their choosing.
5. Derivative Inductor Products and Applications shall be construed to mean any products and/or applications not currently described within III's advertising copy or website or instructional materials as of the date above, including but not limited to the MINIDUCTOR and other products/applications that III and/or Martinez may from time to time develop.
6. III personnel shall assist Martinez with technical, marketing, development, and other mutually agreed upon activities at the rate of $125.00/hour.
7. Martinez shall pay a royalty to III of 16% of the actual selling price of any Inductor/Derivative products, or the cash value of such product transferred in any other way such as into a leasing program or business regardless of ownership thereof.
8. III shall have the right to audit sales records of Martinez re. Inductor Product sales.
9. Royalties shall be computed and payable quarterly.
10. During any calendar year the minimum royalty payments to III shall be $100,000.00 regardless of sales.

Mr. Martinez, I hope that the above proposal will serve as the basis of a growing and mutually beneficial relationship between our respective companies.

Respectfully,

David R. Pacholok
Induction Innovations Incorporated

# EXHIBIT D



SEP-17-2008 07:31 PM                                                           P.03



## PATENT ASSIGNMENT AND SALE

David Pacholok and Thomas Gough do hereby assign and transfer to Induction Holding Company, LLC, its successors, assigns and legal representatives, all their right, title and interest in the Patents identified as Nos. 6563096 and 6670590 and that patent pending Application, No. 11/260,351 for the United States and its territorial possessions and in all foreign countries, including all rights to pursue damages for past, present and future infringement and to claim priority in and to any and all improvements which are disclosed in the patents and legal equivalents thereof in this or a foreign country, including any continuations, divisions, renewals, reissues, reexaminations or substitutes thereof.

Induction Holding Company, LLC shall be dissolved upon termination of all enforceable proceedings concerning the above patents and patent applications thereof. The LLC will be terminated so inventors will hold patents personally.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of December 12, 2006.

**ASSIGNORS:**

David Pacholok _____ Thomas Gough    12/12/06

Reaffirmed on 01/17/07.

By:

David R. Pacholok    1-17-07     Thomas Gough    1/17/07

SEP-12-2008 03:10 PM                                           P.01
05/12/2008  11:56  6968588515        MICHAEL P MAZZA     PAGE  01/01

*PATENT*

For:   U.S. Rights and Foreign Rights
For:   U.S. Application and Patents
By:    Inventor

### ASSIGNMENT OF INVENTIONS

In consideration of the payment by ASSIGNEE to ASSIGNOR of the sum of One Dollar ($1.00), the receipt of which is hereby acknowledged, and for other good and valuable consideration,

**ASSIGNOR:**

Induction Holding Company, LLC
120 Center Drive
Gilberts, IL  60136
United States of America

hereby sells, assigns and transfers to
**ASSIGNEE:**
David Pacholok                          Thomas M. Gough as President
1815 W. Main St.                        Induction Holding Company, LLC
Sleepy Hollow, IL  60118                Gilberts, IL  60136
Nationality: United States of America   Nationality: United States of America

and the successors, assigns and legal representatives of the ASSIGNEE the entire right, title and interest for the United States and its territorial possessions and in all foreign countries, including all rights to claim priority, in and to any and all improvements which are disclosed in the inventions in United States Patent Nos. 6563096 and 6670590, as well as in United States patent pending Application No. 11/260,351 entitled: UNIVERSAL HEATING APPARATUS filed on October 27, 2005, and any legal equivalents thereof in a foreign country, including the right to claim priority and, in and to, all Letters Patent to be obtained for said invention by the above application or any continuation, division, renewal, or substitute thereof, and as to letters patent for any reissue or re-examination thereof.

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this assignment.

ASSIGNOR further covenants that ASSIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to said invention and said Letters Patent and legal equivalents as may be known and accessible to ASSIGNOR and will testify as to the same in any interference, litigation or proceeding related thereto and will promptly execute and deliver to ASSIGNEE or its legal representatives any and all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce said application, said invention and said Letters Patent and said equivalents thereof which may be necessary or desirable to carry out the purposes thereof.

Date of signing                        INDUCTION HOLDING COMPANY, LLC

8-12-08                                By: _____
_____           Thomas M. Gough, President

                                       _____
                                                David Pacholok

# EXHIBIT E to be filed under seal upon entry of an order



# EXHIBIT F





A 7483058

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

**June 25, 2014**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE OF A DOCUMENT RECORDED ON
AUGUST 29, 2013.

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



R. PONDEXTER
Certifying Officer



EXHIBIT
2

**502476817    08/29/2013**

## PATENT ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| Mr. Thomas Gough | 07/15/2013 |

RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Sarge Holdings Company |
| Street Address: | 1175 Jansen Farm Court |
| City: | Elgin |
| State/Country: | ILLINOIS |
| Postal Code: | 60123-2595 |

PROPERTY NUMBERS Total: 3

| Property Type | Number |
|---|---|
| Application Number: | 29423704 |
| Patent Number: | 6563096 |
| Patent Number: | 6670590 |

CORRESPONDENCE DATA

Fax Number:
*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*
Phone:               6308585071
Email:               mazza@mazzallc.com
Correspondent Name:  Michael Mazza
Address Line 1:      686 Crescent Blvd
Address Line 4:      Glen Ellyn, ILLINOIS 60137

| NAME OF SUBMITTER: | Michael P. Mazza |
|---|---|
| Signature: | /Michael P. Mazza/ |
| Date: | 08/29/2013 |

Total Attachments: 2
source=Induction Assignment#page1.tif
source=Induction Assignment#page2.tif

**OP  $120.00  29423704**

## ASSIGNMENT OF INTELLECTUAL PROPERTIES

**WHEREAS**, Induction Innovations, Inc., Induction Holding Company, LLC, Thomas M. Gough, Individually, and/or Surge Holdings Company, LLC (collectively "the Parties") own the following intellectual properties (collectively "the Properties"):

### Patents

U.S. Patent No. 6,563,096: Eddy current/hysteretic heater apparatus and method of use; Issued: 5/13/2003
U.S. Patent No. 6,670,590: Eddy current/hysteretic heater apparatus; Issued: 12/30/2003
Australian Patent No. 343968: Handheld, Inline Induction Heater; Issued: 8/20/2012 (Atty. Dkt. 10141DES_AUS)
European Patent No. 002076372-0001: Handheld, Inline Induction Heater; Issued: 7/19/2012 (Atty. Dkt. 10141DES_EPO)
United States Design Application No. 29/423,704; Handheld, Inline Induction Heater; Filed: 6/4/2012 (Atty. Dkt. 10141DES)
European Patent Application No. 11195710.6; 240V Mini Ductor Design; Filed: 12/23/2011 (Atty. Dkt. 10135EU_EPO)

### Trademarks and Service Marks

Registration No. 2,739,855: I (stylized design); registered 7/22/2003 (Atty. Dkt. TM2093)
Registration No. 2,739,854: Concentrator; registered 7/22/2003 (Atty. Dkt. TM2092)
Registration No. 2,739,856: Glass Blaster; registered 7/22/2003 (Atty. Dkt. TM3069)
Registration No. 4,244,861: Invisible Heat; registered 11/20/2012 (Atty. Dkt. TM3024)
Registration No. 4,221,532: Mini-Ductor; registered 10/9/2012 (Atty. Dkt. TM3027)
Registration No. 2,712,262: Inductor; registered 4/29/2003 (Atty. Dkt. TM3067)
Registration No. 2,770,953: Fast-Off; registered 10/7/2003 (Atty. Dkt. TM3068)
Serial No. 85/872,695: Induction Innovations; filed 3/11/2013 (Atty. Dkt. SM3070)
Serial No. 85/959,438: Mini-Ductor design; filed 6/13/2013 (Atty. Dkt. TM3071)

### Copyrights

TX 7-669-053: Operating and Safety Instructions Mini Ductor (2005), effective registration 1-24-2013
TX 7-687-494: Mini Ductor Operating and Safety Instructions (2009), effective registration 1-24-2013
TX 7-682-894: Operating and Safety Instructions MD-600 (2006), effective registration 1-24-2013
TX 7-689-298: MD-600 Gerber File, effective registration 1-24-2013

and any legal equivalent thereof in a foreign country, including the right to claim priority in and to, all Letters Patents and Trademarks and Service marks to be obtained by the above applications or registrations, and as to letters patents any continuation, division, renewal, or substitute thereof, or any reissue or re-examination thereof, and including the right to collect past, present and future damages thereon;

By and through this Assignment of Intellectual Properties, the Parties hereby transfer each of the Properties to Surge Holdings Company, LLC. If any of the Properties are already owned by Surge Holdings Company, LLC, this assignment is moot as to them. In consideration of the payment by ASSIGNEES to ASSIGNOR of the sum of One Dollar ($1.00), the receipt of which is hereby acknowledged, and for other good and valuable consideration;

ASSIGNORS:

Induction Innovations, Inc.
1175 Jansen Farm Court
Elgin, IL 60123

Induction Holding Company, LLC
1175 Jansen Farm Court
Elgin, IL 60123

Thomas M. Gough, Individually
1175 Jansen Farm Court
Elgin, IL 60123-2595
Nationality: United States of America

hereby sell, assign and transfer to

ASSIGNEE:                    Sarge Holdings Company, LLC
                             1175 Jansen Farm Court
                             Elgin, IL 60123-2595

and the successors, assigns and legal representatives of the ASSIGNEE, the entire right, title and interest in the Properties for the United States and its territorial possessions and in all foreign countries, including all rights to claim priority, in and to any and all improvements therein.

ASSIGNORS hereby covenant that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this assignment.

ASSIGNORS further covenant that ASSIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to the Properties and legal equivalents as may be known and accessible to ASSIGNORS and will testify as to the same in any interference, litigation or proceeding related thereto and will promptly execute and deliver to ASSIGNEE or its legal representatives any and all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce the Properties and said equivalents thereof which may be necessary or desirable to carry out the purposes thereof.

Date of signing    07/15/2013

Induction Innovations, Inc.

By: _____
    Its President

Induction Holding Company, LLC

By: _____
    Its President

Thomas Gough

_____
Individually

Sarge Holdings Company, LLC

By: _____
    Its President

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

INDUCTION INNOVATIONS, INC., and )
SARGE HOLDINGS COMPANY, LLC, )
    Plaintiffs/Counter-Defendants, )    Case No.: 13-cv-05102
v. )    Judge Manish Shah
DAVID PACHOLOK, )
    Defendant/Counter-Plaintiff. )

## DAVID PACHOLOK'S STATEMENT REGARDING INVENTORSHIP CLAIMS

NOW COMES, David Pacholok ("Pacholok"), through his attorneys, Waltz, Palmer & Dawson, LLC, and makes the following statements in regard to this litigation.

1)    I am a defendant in this matter. I have read the second amended complaint. Thomas Gough and I are currently listed as joint inventors of the Patents known as USPN 6563096 and 6670590 ("the Patents"). I am no longer seeking a declaratory judgment stating that Thomas Gough is not a joint inventor of the Patents. I covenant that I will not replead a counterclaim for correction of inventorship (if I am required to answer again in this case) as long as the Plaintiffs' declaratory judgment action regarding inventorship (Count I of the Second Amended Complaint or its successors in future amended complaints) is dismissed.

3)    I covenant not to institute any action to challenge Thomas Gough's status as a joint inventor of the Patents against Induction Innovations, Inc. and/or Sarge Holdings Company, LLC in the future except as set forth in in this document.

4)    I will only file an action against Induction Innovations, Inc. and/or Sarge Holdings, LLC challenging Thomas Gough's status as a joint inventor of the Patents under the following circumstances: (a) if some third party challenges the validity of the Patents based upon inventorship, and an action for correction of inventorship is reasonably required to protect the validity of the Patents and/or my rights to the Patents; or (b) Plaintiffs' pending declaratory judgment action regarding inventorship (or its successors in future amended complaints) is not dismissed. To my knowledge, no third party is currently making any such claims.

5)    I expressly reserve all actions, claims, and demands against Sarge Holdings Company, LLC and Induction Innovations, Inc. except as set forth in this document (including but not limited to, claims for breach of contract, ownership claims regarding the patents, and all other claims I have pleaded in this litigation or the companion state court litigation). This document is not a release. I expressly reserve all actions, claims and demands of any kind against any other person or entity.

6)    The statements in this document reflect the entire covenant not to sue, and there are no other statements, promises, or inducements regarding foregoing my rights in litigation.



David Pacholok

Dated: July 3, 2014

Respectfully Submitted,
David Pacholok
By: /s/ Michael Martin-Johnston
     Michael Martin-Johnston #6286805
     Joseph P. Selbka #6238063
     Attorneys for Defendant
     Waltz, Palmer & Dawson, LLC
     3701 Algonquin Rd., Suite 390
     Rolling Meadows, Illinois 60008
     (847) 253-8800

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INDUCTION INNOVATIONS, INC., and | ) | |
| SARGE HOLDINGS, LLC, | ) | |
| Plaintiffs, | ) | Case No. 1:13-cv-05102 |
| | ) | |
| v. | ) | Judge James B. Zagel |
| | ) | |
| DAVID PACHOLOK, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR**
**A TEMPORARY RESTRAINING ORDER AGAINST DAVID PACHOLOK**

**I.      INTRODUCTION**

Earlier this year, Plaintiffs learned that Defendant David Pacholok ("Pacholok") attempted to license U.S. Patent Nos. 6,563,096 and 6,670,590 ("Induction's Patents"), which cover important technology to Plaintiff Induction Innovations, Inc.'s ("Induction's") business, as well as proprietary Induction information, including trade secrets, customer and vendor information and know-how ("Induction's Secrets"), to a direct Induction competitor, Lace Technologies, Inc. ("Lace"). Induction was forced to sue Lace (Case No. 13-cv-219). Now, in the past week, Induction has learned that Pacholok is in licensing discussions with another third party. To maintain the status quo, Induction seeks a temporary restraining order ("TRO") pursuant to Fed. R. Civ. P. 65 to prevent Pacholok from licensing another third party with Induction's Patents and Secrets, causing further damage to Induction, and likely fomenting further litigation.

1



## II. THE OPERATIVE FACTS: PACHOLOK, AN INVENTOR OF THE PATENTS AND A FIDUCIARY OF INDUCTION, TOOK UNFAIR ADVANTAGE OF A CORPORATE OPPORTUNITY

The operative facts are simple. Thomas Gough ("Gough"), Induction's President, and David Pacholok, Induction's former Secretary, were each the originators, directors, corporate officers and joint owners of Induction, a small, closely-held corporation (7/16/13 Gough Dec., ¶¶2-3, Exhibit 1). Pacholok admits this in the pending state court case[1] (Exhibit 2, Affidavit of David Pacholok, ¶5: "From November 30, 2000 until December 11, 2006, I and Gough were officers, directors, and the only shareholders of III [Induction Innovations, Inc.]."). Gough and Pacholok are also named co-inventors on Induction's Patents (Induction Patents, Exhibit 3).

In 1999-2000, Gough and Pacholok began discussing the formation of a company to make and sell induction heaters to be put to then-novel uses in the automotive aftermarket (Gough Dec., ¶¶3, 7). Although the effective filing date of the two patents is November 27, 2000 (Exhibit 3), three days before Induction was formally incorporated (Gough Dec., Exhibit A, first page), the two partners had been discussing the formation of Induction for months before this formal incorporation date (Gough Dec., ¶¶3, 7). In fact, in October of 2006, Gough and Pacholok reviewed calendars and prepared time lines of events, showing that from at least 10/99-10/30/00 they were working on the "induction project," which included "Induction idea notes" (1/02/00), "Induction uses list (notes)" (2/2/00), drawings of various induction tools "Flameless" and "Odyssey" (May and July, 2000), and an Order for electrical service at a booth at the NACE trade show (10/30/00) (Gough Dec., ¶6; *id.,* Exhibit E). As of 11/20/2000, "Induction Innovations, Inc." had an "Exhibitor Listing" at the NACE 2000 trade show (*id.*, Exhibit F).

---

[1]     Pacholok filed this case in an attempt to recoup royalties from Induction pursuant to an agreement between them.

The two partners of Induction prosecuted the Patents in 2000-2003, with Induction paying for the legal services of a patent agent, and for the prosecution costs and maintenance fees for the Patents (Gough Dec., ¶8). Induction also paid for the significant design, development, tooling, and marketing costs necessary to commercialize the first induction heaters sold under the Patents (*id.*). During this time, the two partners represented to third parties that the Patents were owned by Induction (see, e.g., Gough Dec., ¶6; *id.*, Exhibit C, Pacholok 1/25/04 email and 6/14/06 letter).

Pacholok resigned from Induction in August, 2006, pursuant to a written "Stock Purchase Agreement" ("the "SPA," Gough Dec., Exhibit B); the SPA says nothing about who owns Induction's Patents, and there was no previous agreement concerning that issue.[2]

In late 2011 and early 2012, Pacholok purported to license Lace under the Patents, as well as for "electronic information, designs and other intellectual information published or otherwise made available by Licensor [Pacholok]" (Exhibit 4, 1/12 License Agreement, ¶1, first sentence). Pacholok's purported license and technical assistance both induced and enabled Lace to sell a "BoltBuster" induction heater in direct competition with Induction. In other words, Pacholok took advantage of a corporate opportunity presented to him only because of his fiduciary status while at Induction.

Mr. Gough has formally assigned his ownership rights in Induction's Patents to Induction (Exhibit 5). Mr. Pacholok has not. Thus, Induction owns partial legal title in Induction's

---

[2]     After Pacholok left Induction, Gough and Pacholok executed documents assigning the Patents to a holding company, for purposes of facilitating litigation with Ajax Tocco. After the litigation ended, the Patents were assigned back to Gough and Pacholok. This was done for litigation expediency, and does not reflect any attempt to deal with the "equitable title" issue at stake here. (Gough Dec., ¶6; *id.*, Exhibit D).

Patents, and through this lawsuit, seeks an order that Pacholok's Lace license is null and void, and to assign his legal title to Induction, so that Induction will have full legal title in the Patents[3].

## III.     SEVENTH CIRCUIT STANDARD FOR OBTAINING A TEMPORARY RESTRAINING ORDER

There are five factors for the Court to consider when determining whether a TRO should be granted under Fed. R. Civ. P. 65. *Frullati Franchise Systems, Inc. v. Dana Areece & Co.*, No. 01 C 4703, 2001 WL 743427 *2 (N.D. Ill. June 28, 2001). *See also Yournetdating, LLC v. Mitchell, et al.*, 88 F. Supp. 29 870, 871 (N.D. Ill. Mar. 1, 2000), citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 385-88 (7th Cir. 1984). "As a threshold matter, the plaintiff must show (1) a likelihood of success on the merits, (2) irreparable harm if the TRO is denied, and (3) the inadequacy of a remedy at law.  Once this threshold showing is made, [the Court] balance[s] (4) the harm to plaintiff if the TRO were wrongfully denied against the harm to the defendants if the injunction were wrongfully granted, and (5) the impact on persons not directly concerned in the dispute (the 'public interest')." *Yournetdating*, 88 F. Supp. 29 at 871, citing *Cooper v. Salazar*, 196 F. 3d 809, 813 (7th Cir 1999).

Factor (1) is addressed below. As to factors (2) - (4), Pacholok waited a decade before licensing the patents so he can certainly wait a few more months, but further licensing will cause immediate irreparable harm to Induction. Factor (5) does not appear relevant to this case, other then it favors the protection of Plaintiffs' IP interests.

## IV.     THE OPERATIVE LAW: FIDUCIARY PACHOLOK BREACHED THE CORPORATE OPPORTUNITY DOCTRINE AND MUST ASSIGN HIS PATENT RIGHTS TO INDUCTION

---

[3]         Patents have the attributes of personal property, 35 U.S.C. §261, and each co-inventor automatically owns a complete, undivided interest in the Patents in the absence of an agreement to the contrary. 35 U.S.C. §262.

The operative law is straightforward. Fiduciaries like Pacholok, which includes not only corporate officers but also originators and promoters beginning a new company, owe a fiduciary duty to their corporation to assign inventions developed while they were fiduciaries to the company, particularly where the inventions are squarely within the scope of corporate business, as here. *Scott System, Inc. v. William C. Scott, III*, 996 P.2d 775, 779 (Colo. App. 2000) ("[The] fiduciary duty [of] an officer or director [obligates them] to assign a patent to the corporation if the invention was developed while he or she was employed by the corporation and it is related to the corporation's business."), citing *Lacy v. Rotating Productions Systems, Inc.*, 961 P.2d 1144 (Colo. App. 1998) (reversing the trial court and, without re-trial, ordering a former employee/officer/fiduciary to assign his patent rights to his employer); *Schultz v. iGPS Co., LLC*, 2011 U.S. Dist. LEXIS 92474 (N.D. Ill. 2011) (An officer or director of a corporation "owe[s] the corporation undivided loyalty ... [and has] no right to take advantage of this position of trust and power to obtain property rights which would conflict with his clear duty to his company.") (citing cases); *Golden Eagle/Satellite Archery Inc. v. Epling*, 244 A.D.2d 959, (N.Y. App. Div. 1997) (holding that plaintiff-employer was entitled to summary judgment on breach of fiduciary duty claim based on former CEO's failure to assign patent to it); *Great Lakes Press Corp. v. Froom*, 695 F.Supp. 1440, 1448-49 (W.D.N.Y. 1987) (ordering employee found to have breached his fiduciary rights to company to assign interest in patents to successor-in-interest to former employer); *Davis v. Alwac Int'l, Inc.*, 369 S.W.2d 797 (Tex. Civ. App. 1963) (corporate officer and director named as co-inventor on patent application had fiduciary duty to assign patent to corporation because the invention was related to the business and was developed while he occupied a fiduciary position with the corporation). *See generally 18 AIPLA Q.J.* 127, 132 (1990) ("It is generally accepted that a person who functions, at the time of the invention, in a

5

fiduciary capacity in a business organization, may be under an obligation, in the absence of agreements to the contrary, to assign any patents resulting from the invention to the organization."); 3 *Fletcher Cyclopedia of the Law of Private Corporations* §893 (1917) ("Where evidence sufficiently establishes that a shareholder/director of a closed corporation breached his or her fiduciary duty to the corporation … by exerting control over [a] patent inconsistent with the corporation's interests, the Court may properly assign the patent to the corporation, enjoin the officer not to engage in any activity related to the patented object, and require the officer to turn over objects used to manufacture the patented object.").

Courts have looked to several factors to determine if a fiduciary should be required to assign a patent to his employer, including whether products based on the invention were marketed as the company's products (as is the case here); whether the inventor led the company to believe that the patent was a company asset (it was certainly treated as such here); whether the fiduciary usurped a corporate opportunity by asserting control of a patent to the detriment of the company (that unquestionably occurred here) (Gough Dec., ¶9). *See Dowse v. Federal Rubber Co.*, 254 F.308 (N.D. Ill. 1918); *Kennedy v. Wright*, 676 F.Supp. 888 (C.D. Ill. 1988). *See also Grip Nut Co. v. Sharp*, 150 F.2d 192 (7th Cir. 1945) (president of the company owed duty of fidelity to it, and held patents as a constructive trustee for the company).

Here, there can be no doubt that Pacholok was a fiduciary of Induction, and that he made improper use of a corporate opportunity. In fact, Pacholok colluded with Lace in a scheme to attempt to "burn" Induction's "legal fund" by fighting on two fronts: Pacholok would sue Induction in state court for monies he claimed was owed him from his August, 2006 departure from Induction, while Lace would "occupy" Induction by getting the "BoltBuster off the ground," as Pacholok told Lace's owner, Emily Han, in December of 2012:

I have decided to go after TG for the royalties he owes me. It may cost me a few $1000s of dollars, and I may not succeed, but it will give me satisfaction and will hopefully occupy TG and burn HIS legal fund while you and Charlie get BOLTBUSTER off the ground. (nice job so far!)

(Exhibit 6, 12/8/12 D. Pacholok email, III-DP000701).

Nor did Pacholok's 2006 resignation from III sever his liability for breaches of his fiduciary duty based on transactions which "began during the existence of the relationship or were founded on information acquired during the relationship":

> An officer of a corporation owes a fiduciary duty of loyalty to his corporate employer. (*Graham v. Mimms* (1982), 111 Ill.App.3d 751, 760–61, 67 Ill.Dec. 313, 444 N.E.2d 549, *appeal denied,* 93 Ill.2d 542.) An officer's duty of loyalty includes the obligation to disavow any corporate opportunity where the officer's private interest would conflict with those of the corporation. (*Cross Woods Products, Inc. v. Suter* (1981), 97 Ill.App.3d 282, 285, 52 Ill.Dec. 744, 422 N.E.2d 953 *Patient Care Services v. Segal* (1975), 32 Ill.App.3d 1021, 1029, 337 N.E.2d 471, *appeal denied,* 61 Ill.2d 602.) In determining whether an officer may take advantage of a business opportunity in which a corporation is interested, courts consider whether the corporation had an interest, actual or in expectancy, in the opportunity and whether the acquisition thereof by the officer would hinder or defeat plans and purposes of the corporation in carrying on or developing legitimate business for which it was created. *Paulman v. Kritzer* (1966), 74 Ill.App.2d 284, 219 N.E.2d 541, *affirmed* (1967), 38 Ill.2d 101, 230 N.E.2d 262; *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill.App.2d 38, 46, 219 N.E.2d 860.

> \*   \*   \*

> Defendant's duty is not inconsistent with his right to enter into competition with a former employer upon leaving such employment (absent a restrictive contractual provision to the contrary). (*Voss Engineering, Inc. v. Voss Industries, Inc.* (1985), 134 Ill.App.3d 632, 635–37, 89 Ill.Dec. 711, 481 N.E.2d 63 *Cross Woods Products, Inc. v. Suter* (1981), 97 Ill.App.3d 282, 285, 52 Ill.Dec. 744, 422 N.E.2d 953 **However, the resignation of an officer will not sever liability for transactions completed after the termination of the party's association with the corporation if the transactions began during the existence of the relationship or were founded on information acquired during the relationship.** *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill.App.3d 285, 292, 19 Ill.Dec. 893, 379 N.E.2d 765 *appeal denied,* 72 Ill.2d 582; see also 3 Fletcher, Cyclopedia Corporations § 860, at 264 (1975).

*Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 359-360 (1986) (emphasis added). Here, the Induction Patents which Pacholok purported to license were "founded on information acquired [by Pacholok] during [his] relationship [with Induction]." In fact, Pacholok admits that his fiduciary duties to Induction continue as to "transactions obtained through information founded upon David's relationship with III" (Exhibit 7, Pacholok motion to dismiss in state court, at 5). Thus, Pacholok agrees that he was not permitted to use this information in a manner that would harm Induction, yet he did just that by purporting to license Induction's Patents to Lace (Exhibit 4).

Pacholok may argue that the inventions were conceived before Induction was incorporated. There are several responses to this. First, as a technical matter, each separate *claim* of a patent defines an individual invention, *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984), citing 35 U.S.C. § 282 and *Altoona Publix Theaters, Inc. v. American Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935). But the *claims* of the Patents in their issued form did not even exist until years after Induction was formed, in 2003. Second, as a practical matter, co-inventors Gough and Pacholok were also originators and promoters of Induction; as such, they owed a fiduciary duty to Induction even before it was formally incorporated, while it was still in the planning stages. *Access Cardiosystems, Inc. v. Fincke*, 340 B.R. 127 (B.Ct. Mass. 2006).

*Access Cardiosystems* is squarely on point. Inventor Fincke and his company Access never executed a licensing agreement, as here, and the subject of assignment of patent rights simply "did not come up." Also, as here, the corporation, Access, paid the patent attorney and filing fees to obtain the patent. *Id.*, at 136. After Fincke was ousted by Access, Fincke refused to assign his patent to Access. Just as here, the company Access/Induction paid for the patents, and paid to develop and commercialize the technology. Fincke argue that he conceived of the

8

invention prior to the incorporation of Access, and since he brought the asset into the company, he could freely take it upon departure. Fincke also argued that Access always knew that he owned the patent rights and that he had not executed an assignment of those rights. The *Access* court rejected each argument. First, the court found that in the absence of an executed assignment, even though Fincke owned legal title to his patent, "equitable principles may oblige a named inventor to transfer ownership of his or her rights in a patent or patent application to another entity." *Id.*, at 146 (citing cases). Second, the court found that those who undertake to form and establish a new corporation are its "promoters," and that Fincke was a promoter of Access who "stands in a fiduciary relationship to the company which he or she promotes." *Id.*, at 147 (citing cases). Third, the court found that as a fiduciary, Fincke owed Access duties of care and loyalty, which prohibited him from "engaging in self-dealing and pursuing corporate opportunities," referred to as the "corporate opportunity doctrine." *Id.*, at 148. A fiduciary such as an officer or director, the court found, must first offer the corporation a corporate opportunity, before it can offer it to a third party. *Id.* Otherwise, whatever gain or advantage that was acquired by the fiduciary must be "held for the benefit of the corporation so as to deny [the fiduciary] any benefit or profit." *Id.* As here, in *Access*, the patent covered a product that was "essential to the corporation's viability." *Id.*, at 150. The court ordered that Fincke assign his patent rights to Access, as well as "any other intellectual property associated with Access's business." *Id.*, at 151.

Similarly, in *Stonecraft, LLC v. John Slagter*, 322 F.R. 623, 635-636 (Bank.Ct. N.D. Miss. 2005), Slagter argued that the invention was both conceived and reduced to practice before he came to Stonecraft, and that therefore there was no relevant fiduciary relationship. The court disagreed, finding that a Stonecraft employee, DeFord, even if he was not a co-inventor, was

clearly integrally involved in the reduction to practice of the invention, which included providing testing results used by the patent applicants during the prosecution of the patent within the Patent Office, at Stonecraft's expense. Here, the facts are favor Induction even more than in *Stonecraft*, as Induction not only paid for the Patents (Gough Dec., ¶8), but Induction's co-owners Gough and Pacholok were also each co-inventors working to reduce the inventions to practice while they were forming, and then after they incorporated, Induction.

## V.     **CONCLUSION**

For the foregoing reasons, Pacholok breached his fiduciary duty to Induction, and should be required to assign his rights in Induction's Patents back to Induction. For purposes of this TRO motion, however, Pacholok should be restrained from any further licensing of Induction's Patents, until after a preliminary injunction hearing and then a trial on the matter may be had. Induction also seeks an order finding that Pacholok's purported license to Lace was null and void.

Dated:     July 18, 2013                    Respectfully submitted,

s/Michael P. Mazza/
Michael P. Mazza
Illinois Bar No. 6201609
Dana L. Drexler
Illinois Bar No. 6291515
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, Illinois 60137-4281
Phone: (630) 858-5071
Fax: (630) 282-7123
Email: mazza@mazzallc.com

### CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who have consented to electronic

service are being served with a copy of PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS

MOTION FOR A TEMPORARY RESTRAINING ORDER AGAINST DAVID PACHOLOK

via the Court's CM/ECF system pursuant to L.R. 5.9 on July 18, 2013.

/s/ Michael P. Mazza

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INDUCTION INNOVATIONS, INC., and SARGE HOLDINGS, LLC, | ) ) | |
| Plaintiffs, | ) ) | Case No. 1:13-cv-05102 |
| v. | ) ) | Judge James B. Zagel |
| DAVID PACHOLOK, | ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION**
**FOR A PRELIMINARY INJUNCTION AGAINST DAVID PACHOLOK**



**TABLE OF AUTHORITIES**

*Cases:*                                                                      *Page(s)*

*Frullati Franchise Systems, Inc. v. Dana Areece & Co.*
No. 01 C 4703, 2001 WL 743427 (N.D. Ill. 2001)............................................4

*Yournetdating, LLC v. Mitchell, et, al.,*
88 F. Supp. 29 870,871 (N.D. Ill. 2000).......................................................4

*Roland Mach. Co. v. Dresser Indus., Inc.,*
749 F.2d 380 (7th Cir. 1984)...................................................................4

*Cooper v. Salazar,*
196 F. 3d 809 (7th Circuit 1999)..............................................................4

*Scott System, Inc. v. William C. Scott, III,*
996 p.2d 775 (Colo. App. 2000)................................................................5

*Lacy v. Rotating Production Systems, Inc.,*
961 P.2d 1144 (Colo. App. 1998)..............................................................5

*Schultz v. iGPS Co., LLC,*
2011 U.S. Dist. LEXIS 92474 (N.D. Ill. 2011)...............................................5

*Golden Eagle/Satellite Archery Inc. v. Epling,*
244 A.D.2d 959 (N.Y. App. Div. 1997).......................................................5

*Great Lakes Press Corp. v. Froom*
695 F. Supp. 1440 (W.D.N.Y. 1987)..........................................................5

*Davis v. Alwac Int'l, Inc.,*
369 S.W.2d 797 (Tex. Civ. App. 1963)........................................................5

*Dowse v. Federal Rubber Co.,*
254 F. 308 (N.D. Ill. 1918)....................................................................6

*Kennedy v. Wright,*
676 F. Supp. 888 (C.D. Ill. 1988)..............................................................6

*Grip Nut Co. v. Sharp,*
150 F.2d 192 (7th Cir. 1945)...................................................................6

*Graham v. Mimms* (1982)
111 Ill. App.3d 751, 67 Ill. Dec. 313, 444 N.E. 2d 549,
*Appeal denied,*
93 Ill.2d 542...................................................................................7

*Cross Woods Products, Inc. v. Suter* (1981)
97 Ill. App.3d 282, 52 Ill. Dec. 744, 422 N.E.2d 953............................................7

*Patient Care Services v. Segal* (1975)
32 Ill.App.3d 1021, 337 N.E.2d 471
*Appeal denied,*
61 Ill.2d 602............................................................................................7

*Paulman v. Kritzer* (1966)
74 Ill. App.2d 284, 219 N.E.2d 541,
*Affirmed* (1967)
38 Ill. 2d 101, 230 N.E.2d 262............................................................................7

*Northwestern Terra Cotta Corp. v. Wilson* (1966)
74 Ill. App.2d 38, 46, 219 N.E.2d 860............................................................................7

*Voss Engineering, Inc. v. Voss Industries, Inc.* (1985)
134 Ill. App.3d 632, 89 Ill. Dec. 711, 481 N.E.2d 63............................................7

*Cross Woods Products, Inc. v. Suter* (1981)
97 Ill. App.3d 282, 52 Ill.Dec. 744, 422 N.E.2d 953............................................7

*H. Vincent Allen & Associates, Inc., v. Weis* (1978)
63 Ill. App.3d 285, 19 Ill. Dec. 893, 379 N.E.2d 765
*Appeal denied*
72 Ill.2d 582............................................................................................8

*Comedy Cottage, Inc. v. Berk,*
145 Ill. App.3d 355 (1986)............................................................................8

*Jones v. Hardy,*
727 F.2d 1524 (Fed. Cir. 1984)............................................................................8

*Altoona Publix Theaters v. American Tri-Ergon Corp.,*
294 U.S. 477 (1935)............................................................................8

*Access Cardiosystems, Inc. v. Fincke,*
340 B.R. 127 (B.Ct. Mass. 2006)............................................................................8

*Stonecraft, LLC v. John Slagter,*
332 F.R. 623 (Bank.Ct. N.D. Miss. (2005)............................................................................10

*Statutes and Rules:*

35 U.S.C. §261……………………………………………………………………..4

35 U.S.C. §262……………………………………………………………………..4

## TABLE OF CONTENTS

I.     INTRODUCTION...................................................................................1

II.    THE OPERATIVE FACTS: PACHOLOK, AN INVENTOR OF THE PATENTS
       AND A FUDUCIARY OF INDUCTION, TOOK UNFAIR ADVANTAGE OF A
       CORPORATE OPPORTUNITY...........................................................1

III.   SEVENTH CIRCUIT STANDARD FOR OBTAINING A PRELIMINARY
       INJUNCTION........................................................................................3

IV.    THE OPERATIVE LAW: FIDUCIARY PACHOLOK BREACHED THE
       CORPORATE OPPORTUNITY DOCTRINE AND MUST ASSIGN HIS PATENT
       RIGHTS TO INDUCTION....................................................................4

V.     CONCLUSION......................................................................................10

I.       **INTRODUCTION**

Earlier this year, Plaintiffs learned that Defendant David Pacholok ("Pacholok") attempted to license U.S. Patent Nos. 6,563,096 and 6,670,590 ("Induction's Patents"), which cover important technology to Plaintiff Induction Innovations, Inc.'s ("Induction's") business, as well as proprietary Induction information, including trade secrets, customer and vendor information and know-how ("Induction's Secrets"), to a direct Induction competitor, Lace Technologies, Inc. ("Lace"). Induction was forced to sue Lace (Case No. 13-cv-219). Now, in the past few weeks, Induction has learned that Pacholok is in licensing discussions with another third party. To maintain the status quo, Induction seeks a preliminary injunction ("PI") pursuant to Fed. R. Civ. P. 65 to prevent Pacholok from licensing another third party with Induction's Patents and Secrets, causing further damage to Induction, and likely fomenting further litigation.

Pacholok does not need to license the Patents or Induction's Secrets, as evidence by the decade-long period in which he granted no licenses. But further licensing will unquestionably cause irreparable harm to Induction – the recently-concluded Lace case (Case No. 13-cv-219) shows this, as Induction was forced to issue a license to a direct competitor, as well as incur substantial legal expenses in that case.

Induction filed a motion for a temporary restraining order on July 18, 2013. Pacholok agreed not to issue any licenses until August 6, provided that a PI motion was filed before then (Exhibit 8, 7/22/13 N. Lee email).

II.      **THE OPERATIVE FACTS: PACHOLOK, AN INVENTOR OF
THE PATENTS AND A FIDUCIARY OF INDUCTION,
TOOK UNFAIR ADVANTAGE OF A CORPORATE OPPORTUNITY**

The operative facts are straight-forward. Thomas Gough ("Gough"), Induction's President, and David Pacholok, Induction's former Secretary, were each the originators,

1

directors, corporate officers and joint owners of Induction, a small, closely-held corporation (7/16/13 Gough Dec., ¶¶2-3, Exhibit 1). Pacholok admits this in the pending state court case[1] (Exhibit 2, Affidavit of David Pacholok, ¶5: "From November 30, 2000 until December 11, 2006, I and Gough were officers, directors, and the only shareholders of III [Induction Innovations, Inc.]."). Gough and Pacholok are also named co-inventors on Induction's Patents (Induction Patents, Exhibit 3).

In 1999-2000, Gough and Pacholok began discussing the formation of a company to make and sell induction heaters to be put to then-novel uses in the automotive aftermarket (Gough Dec., ¶¶3, 7). Although the effective filing date of the two patents is November 27, 2000 (Exhibit 3), three days before Induction was formally incorporated (Gough Dec., Exhibit A, first page), the two partners had been discussing the formation of Induction for months before this formal incorporation date (Gough Dec., ¶¶3, 7). In fact, in October of 2006, Gough and Pacholok reviewed calendars and prepared time lines of events, showing that from at least 10/99-10/30/00 they were working on the "induction project," which included "Induction idea notes" (1/02/00), "Induction uses list (notes)" (2/2/00), drawings of various induction tools "Flameless" and "Odyssey" (May and July, 2000), and an Order for electrical service at a booth at the NACE trade show (10/30/00) (Gough Dec., ¶6; *id.,* Exhibit E). As of 11/20/2000, "Induction Innovations, Inc." had an "Exhibitor Listing" at the NACE 2000 trade show (*id.*, Exhibit F).

The two partners of Induction prosecuted the Patents in 2000-2003, with Induction paying for the legal services of a patent agent, and for the prosecution costs and maintenance fees for the Patents (Gough Dec., ¶8). Induction also paid for the significant design, development, tooling, and marketing costs necessary to commercialize the first induction heaters

---

[1]     Pacholok filed this case in an attempt to recoup royalties from Induction pursuant to an agreement between them.

sold under the Patents (*id.*). During this time, the two partners represented to third parties that the Patents were owned by Induction (see, e.g., Gough Dec., ¶6; *id.*, Exhibit C, Pacholok 1/25/04 email and 6/14/06 letter).

Pacholok resigned from Induction in August, 2006, pursuant to a written "Stock Purchase Agreement" ("the "SPA," Gough Dec., Exhibit B); the SPA says nothing about who owns Induction's Patents, and there was no previous agreement concerning that issue.[2]

In late 2011 and early 2012, Pacholok purported to license Lace under the Patents, as well as for "electronic information, designs and other intellectual information published or otherwise made available by Licensor [Pacholok]" (Exhibit 4, 1/12 License Agreement, ¶1, first sentence). Pacholok's purported license and technical assistance both induced and enabled Lace to sell a "BoltBuster" induction heater in direct competition with Induction. In other words, Pacholok took advantage of a corporate opportunity presented to him only because of his fiduciary status while at Induction.

Mr. Gough has formally assigned his ownership rights in Induction's Patents to Induction (Exhibit 5). Mr. Pacholok has not. Thus, Induction owns partial legal title in Induction's Patents, and through this lawsuit, seeks an order that Pacholok's Lace license is null and void, and to assign his legal title to Induction, so that Induction will have full legal title in the Patents[3].

## III. SEVENTH CIRCUIT STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

---

[2] After Pacholok left Induction, Gough and Pacholok executed documents assigning the Patents to a holding company, for purposes of facilitating litigation with Ajax Tocco. After the litigation ended, the Patents were assigned back to Gough and Pacholok. This was done for litigation expediency, and does not reflect any attempt to deal with the "equitable title" issue at stake here. (Gough Dec., ¶6; *id.*, Exhibit D).

[3] Patents have the attributes of personal property, 35 U.S.C. §261, and each co-inventor automatically owns a complete, undivided interest in the Patents in the absence of an agreement to the contrary. 35 U.S.C. §262.

3

There are five factors for the Court to consider when determining whether a preliminary injunction should be granted under Fed. R. Civ. P. 65. *Frullati Franchise Systems, Inc. v. Dana Areece & Co.*, No. 01 C 4703, 2001 WL 743427 *2 (N.D. Ill. June 28, 2001). *See also Yournetdating, LLC v. Mitchell, et al.*, 88 F. Supp. 29 870, 871 (N.D. Ill. Mar. 1, 2000), citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 385-88 (7th Cir. 1984). "As a threshold matter, the plaintiff must show (1) a likelihood of success on the merits, (2) irreparable harm if the PI is denied, and (3) the inadequacy of a remedy at law. Once this threshold showing is made, [the Court] balance[s] (4) the harm to plaintiff if the PI were wrongfully denied against the harm to the defendants if the injunction were wrongfully granted, and (5) the impact on persons not directly concerned in the dispute (the 'public interest')." *Yournetdating*, 88 F. Supp. 29 at 871, citing *Cooper v. Salazar*, 196 F. 3d 809, 813 (7th Cir 1999).

Factor (1) is addressed below. As to factors (2) - (4), Pacholok waited a decade before licensing the patents so he can certainly wait a few more months, but further licensing will cause immediate irreparable harm to Induction. Factor (5) does not appear relevant to this case, other then it favors the protection of Plaintiffs' IP interests.

## IV.  THE OPERATIVE LAW: FIDUCIARY PACHOLOK BREACHED THE CORPORATE OPPORTUNITY DOCTRINE AND MUST ASSIGN HIS PATENT RIGHTS TO INDUCTION

The operative law is straightforward. Fiduciaries like Pacholok, which includes not only corporate officers but also originators and promoters beginning a new company, owe a fiduciary duty to their corporation to assign inventions developed while they were fiduciaries to the company, particularly where the inventions are squarely within the scope of corporate business, as here. *Scott System, Inc. v. William C. Scott, III*, 996 P.2d 775, 779 (Colo. App. 2000) ("[The] fiduciary duty [of] an officer or director [obligates them] to assign a patent to the corporation if

the invention was developed while he or she was employed by the corporation and it is related to the corporation's business."), citing *Lacy v. Rotating Productions Systems, Inc.*, 961 P.2d 1144 (Colo. App. 1998) (reversing the trial court and, without re-trial, ordering a former employee/officer/fiduciary to assign his patent rights to his employer); *Schultz v. iGPS Co., LLC*, 2011 U.S. Dist. LEXIS 92474 (N.D. Ill. 2011) (An officer or director of a corporation "owe[s] the corporation undivided loyalty … [and has] no right to take advantage of this position of trust and power to obtain property rights which would conflict with his clear duty to his company.") (citing cases); *Golden Eagle/Satellite Archery Inc. v. Epling*, 244 A.D.2d 959, (N.Y. App. Div. 1997) (holding that plaintiff-employer was entitled to summary judgment on breach of fiduciary duty claim based on former CEO's failure to assign patent to it); *Great Lakes Press Corp. v. Froom*, 695 F.Supp. 1440, 1448-49 (W.D.N.Y. 1987) (ordering employee found to have breached his fiduciary rights to company to assign interest in patents to successor-in-interest to former employer); *Davis v. Alwac Int'l, Inc.*, 369 S.W.2d 797 (Tex. Civ. App. 1963) (corporate officer and director named as co-inventor on patent application had fiduciary duty to assign patent to corporation because the invention was related to the business and was developed while he occupied a fiduciary position with the corporation). *See generally 18 AIPLA Q.J.* 127, 132 (1990) ("It is generally accepted that a person who functions, at the time of the invention, in a fiduciary capacity in a business organization, may be under an obligation, in the absence of agreements to the contrary, to assign any patents resulting from the invention to the organization."); 3 *Fletcher Cyclopedia of the Law of Private Corporations* §893 (1917) ("Where evidence sufficiently establishes that a shareholder/director of a closed corporation breached his or her fiduciary duty to the corporation … by exerting control over [a] patent inconsistent with the corporation's interests, the Court may properly assign the patent to the corporation, enjoin the

officer not to engage in any activity related to the patented object, and require the officer to turn over objects used to manufacture the patented object.").

Courts have looked to several factors to determine if a fiduciary should be required to assign a patent to his employer, including whether products based on the invention were marketed as the company's products (as is the case here); whether the inventor led the company to believe that the patent was a company asset (it was certainly treated as such here); whether the fiduciary usurped a corporate opportunity by asserting control of a patent to the detriment of the company (that unquestionably occurred here) (Gough Dec., ¶9). *See Dowse v. Federal Rubber Co.*, 254 F.308 (N.D. Ill. 1918); *Kennedy v. Wright*, 676 F.Supp. 888 (C.D. Ill. 1988). *See also Grip Nut Co. v. Sharp*, 150 F.2d 192 (7th Cir. 1945) (president of the company owed duty of fidelity to it, and held patents as a constructive trustee for the company).

Here, there can be no doubt that Pacholok was a fiduciary of Induction, and that he made improper use of a corporate opportunity. In fact, Pacholok colluded with Lace in a scheme to attempt to "burn" Induction's "legal fund" by fighting on two fronts: Pacholok would sue Induction in state court for monies he claimed was owed him from his August, 2006 departure from Induction, while Lace would "occupy" Induction by getting the "BoltBuster off the ground," as Pacholok told Lace's owner, Emily Han, in December of 2012:

> I have decided to go after TG for the royalties he owes me. It may cost me a few $1000s of dollars, and I may not succeed, but it will give me satisfaction and will hopefully occupy TG and burn HIS legal fund while you and Charlie get BOLTBUSTER off the ground. (nice job so far!)

(Exhibit 6, 12/8/12 D. Pacholok email, III-DP000701).

Nor did Pacholok's 2006 resignation from III sever his liability for breaches of his fiduciary duty based on transactions which "began during the existence of the relationship or were founded on information acquired during the relationship":

An officer of a corporation owes a fiduciary duty of loyalty to his corporate employer. (*Graham v. Mimms* (1982), 111 Ill.App.3d 751, 760–61, 67 Ill.Dec. 313, 444 N.E.2d 549, *appeal denied*, 93 Ill.2d 542.) An officer's duty of loyalty includes the obligation to disavow any corporate opportunity where the officer's private interest would conflict with those of the corporation. (*Cross Woods Products, Inc. v. Suter* (1981), 97 Ill.App.3d 282, 285, 52 Ill.Dec. 744, 422 N.E.2d 953 *Patient Care Services v. Segal* (1975), 32 Ill.App.3d 1021, 1029, 337 N.E.2d 471, *appeal denied*, 61 Ill.2d 602.) In determining whether an officer may take advantage of a business opportunity in which a corporation is interested, courts consider whether the corporation had an interest, actual or in expectancy, in the opportunity and whether the acquisition thereof by the officer would hinder or defeat plans and purposes of the corporation in carrying on or developing legitimate business for which it was created. *Paulman v. Kritzer* (1966), 74 Ill.App.2d 284, 219 N.E.2d 541, *affirmed* (1967), 38 Ill.2d 101, 230 N.E.2d 262; *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill.App.2d 38, 46, 219 N.E.2d 860.

\*     \*     \*

Defendant's duty is not inconsistent with his right to enter into competition with a former employer upon leaving such employment (absent a restrictive contractual provision to the contrary). (*Voss Engineering, Inc. v. Voss Industries, Inc.* (1985), 134 Ill.App.3d 632, 635–37, 89 Ill.Dec. 711, 481 N.E.2d 63 *Cross Woods Products, Inc. v. Suter* (1981), 97 Ill.App.3d 282, 285, 52 Ill.Dec. 744, 422 N.E.2d 953 **However, the resignation of an officer will not sever liability for transactions completed after the termination of the party's association with the corporation if the transactions began during the existence of the relationship or were founded on information acquired during the relationship.** *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill.App.3d 285, 292, 19 Ill.Dec. 893, 379 N.E.2d 765 *appeal denied*, 72 Ill.2d 582; see also 3 Fletcher, Cyclopedia Corporations § 860, at 264 (1975).

*Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 359-360 (1986) (emphasis added). Here, the

Induction Patents which Pacholok purported to license were "founded on information acquired

[by Pacholok] during [his] relationship [with Induction]." In fact, Pacholok admits that his

fiduciary duties to Induction continue as to "transactions obtained through information founded

upon David's relationship with III" (Exhibit 7, Pacholok motion to dismiss in state court, at 5).

Thus, Pacholok agrees that he was not permitted to use this information in a manner that would

harm Induction, yet he did just that by purporting to license Induction's Patents to Lace (Exhibit 4).

Pacholok may argue that the inventions were conceived before Induction was incorporated. There are several responses to this. First, as a technical matter, each separate *claim* of a patent defines an individual invention, *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984), citing 35 U.S.C. § 282 and *Altoona Publix Theaters, Inc. v. American Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935). But the *claims* of the Patents in their issued form did not even exist until years after Induction was formed, in 2003. Second, as a practical matter, co-inventors Gough and Pacholok were also originators and promoters of Induction; as such, they owed a fiduciary duty to Induction even before it was formally incorporated, while it was still in the planning stages. *Access Cardiosystems, Inc. v. Fincke*, 340 B.R. 127 (B.Ct. Mass. 2006).

*Access Cardiosystems* is squarely on point. Inventor Fincke and his company Access never executed a licensing agreement, as here, and the subject of assignment of patent rights simply "did not come up." Also, as here, the corporation, Access, paid the patent attorney and filing fees to obtain the patent. *Id.*, at 136. After Fincke was ousted by Access, Fincke refused to assign his patent to Access. Just as here, the company Access/Induction paid for the patents, and paid to develop and commercialize the technology. Fincke argue that he conceived of the invention prior to the incorporation of Access, and since he brought the asset into the company, he could freely take it upon departure. Fincke also argued that Access always knew that he owned the patent rights and that he had not executed an assignment of those rights. The *Access* court rejected each argument. First, the court found that in the absence of an executed assignment, even though Fincke owned legal title to his patent, "equitable principles may oblige a named inventor to transfer ownership of his or her rights in a patent or patent application to

8

another entity." *Id.*, at 146 (citing cases). Second, the court found that those who undertake to form and establish a new corporation are its "promoters," and that Fincke was a promoter of Access who "stands in a fiduciary relationship to the company which he or she promotes." *Id.*, at 147 (citing cases). Third, the court found that as a fiduciary, Fincke owed Access duties of care and loyalty, which prohibited him from "engaging in self-dealing and pursuing corporate opportunities," referred to as the "corporate opportunity doctrine." *Id.*, at 148. A fiduciary such as an officer or director, the court found, must first offer the corporation a corporate opportunity, before it can offer it to a third party. *Id.* Otherwise, whatever gain or advantage that was acquired by the fiduciary must be "held for the benefit of the corporation so as to deny [the fiduciary] any benefit or profit." *Id.* As here, in *Access*, the patent covered a product that was "essential to the corporation's viability." *Id.*, at 150. The court ordered that Fincke assign his patent rights to Access, as well as "any other intellectual property associated with Access's business." *Id.*, at 151.

Similarly, in *Stonecraft, LLC v. John Slagter*, 322 F.R. 623, 635-636 (Bank.Ct. N.D. Miss. 2005), Slagter argued that the invention was both conceived and reduced to practice before he came to Stonecraft, and that therefore there was no relevant fiduciary relationship. The court disagreed, finding that a Stonecraft employee, DeFord, even if he was not a co-inventor, was clearly integrally involved in the reduction to practice of the invention, which included providing testing results used by the patent applicants during the prosecution of the patent within the Patent Office, at Stonecraft's expense. Here, the facts are favor Induction even more than in *Stonecraft*, as Induction not only paid for the Patents (Gough Dec., ¶8), but Induction's co-owners Gough and Pacholok were also each co-inventors working to reduce the inventions to practice while they were forming, and then after they incorporated, Induction.

9

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Pacholok breached his fiduciary duty to Induction, and should be required to assign his rights in Induction's Patents back to Induction. For purposes of this PI motion, however, Pacholok should be restrained from any further licensing of Induction's Patents, until after a preliminary injunction hearing and then a trial on the matter may be had. Induction also seeks an order finding that Pacholok's purported license to Lace was null and void.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INDUCTION INNOVATIONS, INC., and )
SARGE HOLDINGS COMPDANY, LLC, )
                      Plaintiffs, )    Case No. 1:13-cv-05102
                               )
v. )    Judge James B. Zagel
                               )
DAVID PACHOLOK, )    Magistrate Judge Geraldine Brown
                   Defendant. )

## EXHIBIT LIST

The following Exhibits are attached to and in support of Plaintiff's Memorandum in

Support of Their Motion for a Preliminary Injunction Against David Pacholok:

Exhibit 1:    Tom Gough Declaration dated 7/16/13

        Exhibit A:    Corporation Detail Report from Secretary of State
        Exhibit B:    Stock Purchase Agreement **UNDER SEAL**
        Exhibit C:    Pacholok 1/25/04 email and 6/14/06 letter
        Exhibit D:    Patent Assignment and Sale
        Exhibit E:    Calendars and prepared time lines of events **UNDER SEAL**
        Exhibit F:    Exhibitor Listing
        Exhibit G:    Induction Corporate document **UNDER SEAL**
        Exhibit H:    Induction check written to David Pacholok

Exhibit 2:    Affidavit of David Pacholok

Exhibit 3:    Induction Patents

Exhibit 4:    1/2012 License Agreement **UNDER SEAL**

Exhibit 5:    Exclusive License Agreement **UNDER SEAL**

Exhibit 6:    12/8/12 Pacholok email III-DP000701

Exhibit 7:    Pacholok Motion to Dismiss in State Court

Exhibit 8:    7/22/13 N. Lee Email