INDUCTION INNOVATIONS, INC., and
SARGE HOLDINGS COMPANY, LLC,

                Plaintiffs,

                v.

DAVID PACHOLOK,

                Defendant.

No. 13 CV 5102

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

David Pacholok co-founded Induction Innovations, an Illinois corporation that manufactures and sells induction-heating products, with Thomas Gough. Pacholok and Gough are also the named inventors of two U.S. patents that concern induction-heating devices used for automotive repair. After several years at Induction, Pacholok agreed to resign his position as corporate officer and sell his stock in the company in exchange for a royalty on the sale of certain products. But Induction owed Pacholok a royalty only if relevant sales exceeded $1 million in a calendar year.

In 2013, Induction (and the assignee of Gough's ownership in the two patents, Sarge Holdings) sued Pacholok seeking, among other things, a declaratory judgment that no money is owed Pacholok under the royalty agreement. Induction filed a motion for summary judgment. For the reasons discussed below, Induction's motion is denied.

# I.     Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). In reviewing a summary-judgment motion, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

# II.    Facts

Thomas Gough and David Pacholok are the named inventors of United States patents 6,563,096 and 6,670,590, which in general claim an induction-heating apparatus and a method for using induction heating in automotive repair. *See* [240] at 3 ¶ 9; [173-5].[1] In 2000, Gough and Pacholok co-founded Induction Innovations,

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken largely from the parties' Local Rule 56.1 Statements of Undisputed Material Fact (and answers or exhibits thereto). Defendant's motion for leave to file a corrected version of his Rule 56.1 statement and memorandum in opposition to summary judgment, [238], is granted in part. The court will consider the corrected version of defendant's submissions (now docketed at [240]) in place of his original filings; but the arguments in plaintiffs' reply will not be stricken. Some of the documents referenced in this opinion were filed under seal. To the extent the opinion discusses any content previously filed under seal, the party that originally filed that document must file on the court's docket a public version of the same. The public version

Inc., an Illinois corporation that makes and sells induction heaters for the automotive aftermarket. *See* [240] at 2 ¶ 1; *id.* at 3 ¶¶ 8, 10. Initially, Gough and Pacholok each owned fifty percent of the company's stock, with Gough acting as Induction's president and Pacholok serving as a corporate officer and director. *See id.* at 2 ¶ 3; *id.* at 3 ¶ 7. Pacholok later resigned his position with the company and relinquished his stock as part of a Stock Purchase Agreement. *See id.* at 2 ¶ 3; *id.* at 3 ¶ 11. Section 3 of the agreement provides:

> In and for the consideration of Pacholok returning his stock in the Corporation, the Corporation does hereby agree to pay to him the following amounts and other considerations: . . .
>
> (e)     Royalty on goods sold by the Corporation with the license to utilize one or more of the Patents (so long as same are valid) based on annual (calendar year) gross sales, less returns, commencing January 1, 2007, and without regard to future products and accessories, on the following schedule:

| | |
|---|---|
| $0 to $1,000,000.00 | 0% |
| $1,000,001.00 to $1,100,000.00 | 1% |
| $1,100.001.00 to $1,200,000.00 | 2% |
| $1,200,001.00 to $1,300,000.00 | 3% |
| $1,300,001.00 to $1,400,000.00 | 4% |
| $1,400,001.00 and thereafter, | 5% |

[173-4] at 2–3. The agreement states that "the Corporation" means Induction Innovations, Inc., and defines "Patents" as "intellectual property consisting of United States Patents, numbers 6563096 and 6670590 and patent pending for issuance known as number US 11/260,351." *Id.* at 2. (According to Induction, U.S. patent application 11/260,351 was later abandoned. *See* [235] at 11 n. 4.)

---

should leave visible any content addressed below. *See City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014).

In 2013, Induction filed a declaratory-judgment action against Pacholok, alleging that no royalties were owed under the agreement because in no calendar year since January 1, 2007 has Induction sold more than a million dollars of goods encompassed by Section 3(e). *See* Second Amended Complaint, [139] ¶¶ 56–57. Induction now moves for summary judgment on its no-royalties claim. [170].[2]

## III.  Analysis

The parties agree that Illinois law applies to this dispute. Contract interpretation is a question of law. *Hanover Ins. Co. v. Northern Building Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citation omitted). In Illinois, as elsewhere, the principal objective in construing a contract is "to give effect to the intent of the parties." *Peoples Gas Light and Coke Co. v. Beazer East, Inc.*, 802 F.3d 876, 881 (7th Cir. 2015) (quoting *Gallagher v. Lenart*, 226 Ill.2d 208, 232 (2007)). The best indication of the parties' intent is the language of the contract itself. *Id.* (citing *Gallagher*, 226 Ill.2d at 233). If the language of the contract is reasonably susceptible to more than one meaning, it is ambiguous and the court may look to extrinsic evidence—*i.e.*, evidence outside the four corners of the contract—to

---

[2] According to Induction's second amended complaint, Gough at some point assigned his ownership rights in the '096 and '590 patents to a company called Sarge Holdings, LLC. *See* [139] ¶ 43; *see also* [240] at 3 ¶ 5 (stating that Sarge is the registered assignee of Induction's intellectual property). Sarge, in turn, licensed to Induction its rights to use and enforce the patents. *See* [240] at 3 ¶ 6; *see also* [173-3] at 2 ("Exclusive License Agreement" between Sarge Holdings and Induction Innovations, dated July 15, 2013). Sarge is also a plaintiff in the present suit, and has moved for summary judgment jointly with Induction. But Sarge is not a party to the contract at issue in the declaratory-judgment claim, and Pacholok offers no argument that Sarge owes royalties to him under the contract. Sarge is therefore irrelevant. For ease of reference, plaintiffs are referred to collectively as "Induction."

determine the parties' intent. *Gallagher*, 226 Ill.2d at 233 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447 (1991); *Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 288 (1990)); *see also Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005).

### A.    Construction of the Stock Purchase Agreement

Section 3(e) of the agreement states that Induction agrees to pay Pacholok a "[r]oyalty on goods sold by the Corporation with the license to utilize one or more of the Patents." [173-4] at 3. Although the phrasing is somewhat clumsy, the meaning of this clause is clear. "Patents" is explicitly defined in the contract to mean the '096 and '590 patents (and a pending US patent application not at issue here). "[W]ith the license to utilize one or more of the Patents" is a modifier, and it is modifying one of two things: (1) "goods sold" (such that only "goods sold . . . with the license to utilize . . . the Patents" count toward the royalty base); or (2) "the Corporation" (such that only goods sold by "the Corporation with the license to utilize . . . the Patents," as opposed to some other corporation, are relevant). The second interpretation is not a plausible one. Like the word "Patents," "Corporation" is also explicitly defined in the agreement: here, it means Induction Innovations. *See id.* at 2. So there is no need to clarify which "corporation" is the operative one in Section 3(e), and "with the license to utilize . . . the Patents" must therefore refer to "goods sold." *See Peoples Gas*, 802 F.3d at 881–82 ("[C]ourts should not interpret a contract in a manner that would nullify or render provisions meaningless . . . ." (quoting *Thompson v. Gordon*, 241 Ill.2d 428, 442 (2011))) (internal quotation marks

omitted); *Nautilus Ins. Co. v. Bd. of Dirs. of Regal Lofts Condo. Ass'n*, 764 F.3d 726, 735 (7th Cir. 2014) (similar) (also applying Illinois law).

The parties agree that "goods sold . . . with the license to utilize one or more of the Patents" concerns the sale of goods covered by the '096 or '590 patent—that is, goods embodying one or more of the patented inventions. *See* [171] at 8–9; [240] at 26. This is a sensible reading, and the most reasonable one in context. To "utilize" means "to make use of," to "turn to practical use or account." *See* Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/utilize (last visited December 30, 2015). Thus, a "license to utilize" the patents is a license to practice the patented inventions. The "license" is not explicitly defined. The Stock Purchase Agreement mentions no other license to practice the patents at issue (for example, a license that exists separately from the agreement[3] and limits the rights granted to certain modes of practicing the inventions), and this leads to two conclusions. First, the license described in Section 3(e) is broad—it encompasses the full spectrum of rights otherwise afforded only to the patentee. Second, the license is effected through that same section of the agreement—in other words, in exchange for royalty payments, Pacholok agrees under Section 3(e) not only to return his stock, but also to grant Induction an unlimited license to practice the '096 and '590

---

[3] As discussed above at note 2, Induction at some point obtained a license to practice the patents from Sarge Holdings (which acquired ownership rights by assignment from Thomas Gough, Pacholok's co-patentee). But the license from Sarge was not executed until 2013. *See* [173-3] at 2. The agreement with Pacholok was signed in 2006. *See* [173-4] at 5.

patents. To the extent such practice results in a sale (by Induction, and covered by other provisions of the contract), that sale must be counted toward the royalty base.

The contract also provides that royalties on "goods sold by the Corporation" must be calculated "without regard to future products and accessories." [173-4] at 3. Induction argues that the "without regard to" clause is a carve-out that excludes from the royalty base all sales of "future products and accessories." *See* [171] at 8. Pacholok agrees that the phrase "without regard to" may signal an exclusion, but argues that the term may instead mean that "future products and accessories" should be included in the royalty base. *See* [240] at 23. Pacholok does not explain how he arrives at this alternative interpretation, but presumably he means that "without regard to" could in this case mean "no matter whether" or "whether or not"—such that the agreement provides for a royalty on the sale of patented goods *whether or not* they are "future products and accessories." This construction effectively reads "without regard to . . . " out of the contract, and it is not, consequently, a reasonable interpretation. *See Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014) (explaining that, whenever possible, the court should "avoid a construction that would render a provision [of the contract] superfluous" (citing *Kim v. Carter's, Inc.*, 598 F.3d 362, 364 (7th Cir. 2010); *Matthews v. Chicago Transit Auth.*, 9 N.E.3d 1163, 1188 (Ill. App. Ct. 2014))). For this clause to have meaning, "without regard to" must be read as "not including." Thus, sales of patented goods count toward the royalty base

*unless* they are sales of "future products and accessories." Future products and accessories, in turn, must comprise a subset of patented goods.

But is it one subset or two? In other words, does "future" describe "products and accessories" together, such that a single subset of patented goods ("future" goods) is excluded from the royalty base? Or does "future" modify only "products," in which case two different subsets of patented goods—"future products" and, separately, "accessories"—are excepted? The latter interpretation would be plausible if the parties had agreed to calculate royalties owed "without regard to future products *or* accessories." In that case, "accessories" could reasonably refer to a second category of excluded sales, distinct from "future products." But the parties wrote instead that royalties would be calculated "without regard to future products *and* accessories," indicating that "products" and "accessories" are a single group of patented goods, distinguishable from the larger set of patented goods by the fact that they are "future" patented goods. The plain and ordinary meaning of Section 3(e) shows that the parties intended sales of "future" patented goods to be excluded from the royalty base.

Pacholok argues that the Stock Purchase Agreement is still ambiguous and so cannot be construed as a matter of law because the meaning of "future" remains unclear. *See* [240] at 23–24. There is no ambiguity here. "Future" generally means existing or occurring at a later time. *See* Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/future (last visited December 30, 2015). Nothing in the contract suggests that the parties intended to employ this

term in an exceptional way. Thus, "future products and accessories" plainly refers to products and accessories not yet in existence as of a certain date.

Induction argues that the cutoff date is the effective date of the contract (August 31, 2006). *See* [171] at 8–9. Pacholok agrees that the effective date is one possible demarcation between present and "future" goods, but argues that the date of signature (December 11, 2006), or the date when royalties would begin to accrue under the agreement (January 1, 2007), are also possibilities. *See* [240] at 24; [173-4] at 3, 5. The effective date of the contract establishes the proper dividing line. The word "future," as just explained, refers to something not presently in existence. The present, in turn, is ostensibly the time at which the contract is signed, because it is at this point that the signatories make known their agreed intentions. But where, as here, the agreement also includes an effective date, it is as though the parties put pen to paper on *that* date. An effective date operates to shift the "present" forward or backward—in this case backward, from December 11, 2006 to August 31, 2006. Section 3(e) of the Stock Purchase Agreement therefore excludes from the royalty base any sales of patented goods that did not exist before August 31, 2006.

Section 3(e) also limits the royalty base to sales occurring on or after January 1, 2007, *see* [173-4] at 3 (stating that Induction owes Pacholok a royalty "based on annual . . . gross sales, less returns, commencing January 1, 2007"), and requires that the base exceed $1 million in a calendar year for royalties to accrue, *see id.* (setting forth a graduated schedule, with a 0 % royalty owed on annual sales of $0

to $1,000,000, and 1% owed on annual sales of $1,000,001 to $1,100,000, etc.). There is no dispute about the meaning of these terms.

In sum, Section 3(e) of the Stock Purchase Agreement requires Induction to pay Pacholok a royalty on the sale of goods if: (1) the goods embody one or more of the inventions claimed in the '096 or '590 patent; (2) the goods were sold by Induction ("the Corporation"); (3) the goods sold existed before August 31, 2006; (4) the sale took place on or after January 1, 2007; and (5) such sales exceeded $1 million in the calendar year. This meaning is clear from the face of the contract, and extrinsic evidence is not needed to interpret it. Because the agreement is unambiguous, I also do not address Pacholok's argument that ambiguities should be resolved in his favor under the anti-drafter rule. *See* [240] at 27–28.[4] (The implied covenant of good faith and fair dealing, however, may have a role to play. This issue is discussed below.)

## B.  Application to Certain Categories of Sales

The parties disagree about whether certain categories of product sales count toward the royalty base under Section 3(e).

### 1.  *Modified Products*

First, Induction argues that modified versions of goods that otherwise predate the effective date of the contract, such as the Mini-Ductor, should be

---

[4] The so-called anti-drafter rule provides that ambiguities in a written contract should be construed against the drafter of the agreement. It is a rule "of last resort": it "comes into play only when neither . . . extrinsic evidence nor other methods of construction can resolve the ambiguity." *Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995); *see also Alberto-Culver Co. v. Aon Corp.*, 351 Ill.App.3d 123, 132 (1st Dist. 2004).

excluded from the royalty base because the modified products were first sold after August 31, 2006, and thus are "future" products. *See* [178] at 9–10; [240] at 6 ¶ 26. Pacholok argues that the modified goods are functionally equivalent to their originals, and thus, in accordance with the implied covenant of good faith and fair dealing, must be counted toward the royalty base. *See* [240] at 6 ¶ 25; *id.* at 19–20, 28–29.

The covenant of good faith and fair dealing is implied in every contract, and is most often used as a rule of construction. *See Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 286 (1958); *see also Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). The covenant also applies when one party "has complete control over the occurrence of a condition precedent" in the contract, in which case the covenant operates to "prevent that party from behaving arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Trovare Capital Grp., LLC v. Simkins Indus., Inc.*, 794 F.3d 772, 778 (7th Cir. 2015) (quoting *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill.App.3d 645, 891 N.E.2d 1, 26 (2007)) (internal quotation marks omitted); *see also E.B. Harper & Co., Inc. v. Nortek, Inc.*, 104 F.3d 913, 919 (7th Cir. 1997) (explaining that the implied covenant requires parties to use reasonable efforts to bring about any condition precedent within their control) (citing *Case v. Forloine*, 266 Ill.App.3d 120, 639 N.E.2d 576, 581 (1993)).

For the sale of a patented good to be included in the royalty base under Section 3(e), the good must be a present product—that is, a non-"future" product.

Non-future status is thus a condition precedent to Induction's contractual performance. It is also a condition entirely within Induction's control, as it is within Induction's discretion, not Pacholok's, to determine whether and when existing product lines should be revised or discontinued. Induction, consequently, must exercise that discretion in good faith; it may not intentionally modify goods so as to avoid paying royalties to Pacholok. *Cf. Trovare*, 794 F.3d at 779 (observing that the implied covenant of good faith is violated where the party in control of a condition precedent purposely causes its nonoccurrence).

The parties agree that Induction modified certain of its products after August 31, 2006. But Pacholok points to no evidence suggesting that these changes were undertaken in bad faith. Nor is it of any help to Pacholok that many of the revised goods are, in his estimation, functionally equivalent to their predecessors. Even assuming that a modified good performs the same function as its pre-August 31, 2006 version, the new version is nonetheless a "future" product if it was first manufactured as such after the cutoff date. *See Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 462 (7th Cir. 2014) ("Parties to a contract . . . are entitled to enforce [its] terms . . . to the letter and an implied covenant of good faith cannot overrule or modify the [contract's] express terms . . . ." (quoting *N. Trust Co. v. VIII S. Mich. Assocs.*, 276 Ill.App.3d 355, 657 N.E.2d 1095, 1104 (1995))). Induction was correct to exclude the sales of such products from its royalty calculations.[5]

---

[5] Induction also refers to the implied covenant of good faith and fair dealing, arguing that the covenant (along with the contract's "cooperation" clause, which states that the parties "shall cooperate and do all acts as may be reasonably required . . . with regard to the

It was not, however, appropriate for Induction to exclude from its calculations all sales of the Mini-Ductor product between November 2006 and spring 2010. According to Induction, the pre-August 31, 2006 Mini-Ductor was changed later that year, when: (1) it was first sold with a carrying case; and (2) its original 90-day warranty was replaced with a one-year warranty. But as far as can be gleaned from the facts presented at summary judgment, there was no change in the Mini-Ductor itself until several years later when, among other things, its heat-dissipating terminal was modified. Induction does not explain, and nor is it clear, how a mere change in warranty would render a product a "future" product under Section 3(e) of the Stock Purchase Agreement. And an induction heater is not a different heater simply because it arrives in a carrying case rather than a cardboard box. As Induction's representative stated at his deposition, a carrying case is something you put a heating product *in. See* July 22, 2015 Deposition of Paul Astrowski, [219-2] at 115, Tr. at 114:1–:3. Adding a case does not change the heater itself. From a manufacturing perspective, Mini-Ductor units sold between November 2006 and

---

fulfillment of . . . the transaction described herein," [173-4] at 4) obligates Pacholok to abstain from licensing the patents at issue to parties other than Induction. *See* [171] at 15; [235] at 13. Since Pacholok did license the patents to another party (one of Induction's competitors), Induction says that Pacholok breached his fiduciary duties to Induction. *See* [235] at 13–14. Pacholok's alleged fiduciary breach does not alter Induction's royalty obligations. The Stock Purchase Agreement makes no reference to Pacholok's ability to license his patent rights to third parties, and likewise makes no attempt to render Pacholok's *lack* of such dealings a condition precedent to the operation of the contract. Whether Pacholok licensed the patents to someone other than Induction, or breached his fiduciary duties to Induction in doing so, is irrelevant to the present inquiry.

spring 2010 appear to be exactly the same as units sold before August 31, 2006. These sales should have been counted toward the royalty.[6]

Pacholok claims that several products in the "Pro-Max" line were also sold in 2006, and so should have been included in the royalty base, too. The evidence suggests that these units were not sold until November 2006—some five months after the effective date of the contract. *See* Induction Innovations, Inc. and Sarge Holdings Company, LLC's Third Supplemental Response to Defendant's First Set of Interrogatories, [219-2] at 181–82. If the units were first manufactured after the effective date, then they were not in existence as of that date and so were properly excluded from the royalty base. However, the date of existence is difficult to discern from the record. (The parties refer only to the date of first sale.) It is at least conceivable that some of these goods were made (and thus practiced the patents) a few months before their first sale. Drawing all reasonable inferences in Pacholok's favor, there remains an issue of fact as to whether Induction correctly excluded all Pro-Max sales from the royalty base.[7]

---

[6] There appears to be some confusion about when the Mini-Ductor's warranty was actually extended, and when the product itself was physically changed. In its initial Local Rule 56.1 submission, Induction stated that the Mini-Ductor's warranty was extended in December 2006 and its heat-dissipating terminal changed in August 2009. *See* [219] at 4–5 ¶¶ 26–27. But in its later response to Pacholok's Rule 56.1 statement, Induction claimed that the warranty was extended in November 2006 and the heat-dissipating terminal changed in late March or early April 2010. *See* [236] at 17 ¶ 40. I assume (in Pacholok's favor) that the latter dates are the correct ones, as they likely represent a larger set of sales that should have been included in Induction's calculations.

[7] Pacholok also contends that sales of some of the Pro-Max (and Mini-Ductor) products should be counted toward the royalty base because Pacholok designed those products before he left Induction. *See* [240] at 25. Even assuming that Pacholok was responsible for these designs—an assertion that Induction disputes—a product design is merely an idea for a

## 2. Stand-Alone Accessories

Sales of what Induction refers to as stand-alone accessories—that is, accessories or attachments sold without induction heaters—were properly excluded from the royalty calculations. Induction argues that it was correct to exclude these sales because stand-alone accessories do not embody all of the claim limitations at issue, and so are not patented goods in the first instance. *See* [171] at 10–11. This is not entirely correct. Selling a component of a patented invention is not an act of *direct* infringement, but selling or offering to sell such a component (within the United States) may nonetheless constitute indirect infringement if: (1) the component is a material part of the invention; (2) the seller knows that the component is especially made or adapted for use in infringing the patent; and (3) the component is not a "staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c); *see also In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (discussing the requirements for contributory infringement) (citations omitted).[8] If, in selling certain accessories, Induction would be liable for

---

future product, not the product itself. The operative question under the Stock Purchase Agreement is whether a *product* existed as of August 31, 2006. The date of design does not define the date of existence.

[8] It is also an act of infringement to supply from the United States a component of a patented invention (that is especially made or adapted for use in the invention, and not a staple article or commodity suitable for substantial noninfringing use), while intending that the component be combined outside of the United States "in a manner that would infringe the patent if such combination occurred within the United States." 35 U.S.C. § 271(f)(2).

contributory infringement, those accessories would be considered patented goods and their sales relevant to determining royalties owed under Section 3(e).

Induction argues that contributory infringement does not apply in this case because the accessories here have noninfringing uses—specifically, non-automotive uses. *See* [235] at 12. (The patents require the application of heat to an automotive vehicle, or for use in automotive repair, *see* [173-5] at 11, 22, so non-automotive applications would fall outside the scope of the patent claims.) It is Pacholok's burden to show that there are no noninfringing uses or, if there are noninfringing uses, that they are not substantial. *See Medtronic, Inc. v. Mirowski Family Ventures*, LLC, 134 S.Ct. 843, 849 (2014) (holding that it is for the patentee to show infringement, even in declaratory-judgment actions where the plaintiff seeks a declaration that its products are not covered by the patent and so no royalties are owed); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) (explaining in a contributory-infringement case that it is the patentee's burden to prove a lack of substantial noninfringing uses). A substantial use is one that is not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental. *Toshiba*, 681 F.3d at 1362 (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).

Pacholok has presented no evidence suggesting that the non-automotive applications for Induction's stand-alone accessories are unusual, occasional, or in any other way insubstantial. Accordingly, Induction would not have needed a

license to sell these accessories, and Induction properly excluded sales of these accessories from the royalty base.

### 3. Induction Heaters Sold for Non-Automotive Uses

Induction did not exclude from its royalty calculations sales of induction heaters sold for non-automotive uses (because the sales data are difficult to parse in this way), but argues that such sales are in principle excludable because, as just noted, the patents cover only automotive applications. Thus, says Induction, these sales are not sales of patented goods. *See* [171] at 9 n. 3; *id.* at 11 n. 7. Pacholok relies on *Intel Corp. v. U.S. International Trade Commission*, 946 F.2d 821 (Fed. Cir. 1991), for the proposition that a manufacturer directly infringes a patent by selling a product that is merely capable of being used for an infringing application. *See* [240] at 26–27 (citing *Intel*, 946 F.2d at 832). Alternatively, Pacholok argues that infringement may occur where there is merely an offer to sell a good for a patented use. *See id.* at 27.

Pacholok's reliance on *Intel* is misplaced. That case addressed a patent claiming a "program*mable* selection means for selecting [an] alternate addressing mode." 946 F.2d at 831 (emphasis added). Thus, to be infringing, the accused device in *Intel* needed only to be capable of operating in the mode described. *See id.* at 832. The claim language here is distinguishable. The '590 patent claims a "heater apparatus used in automotive repair," [173-5] at 11 (claims 1 and 13); and the '096 patent claims a method for "heating of an area of a body of an automotive vehicle" (claims 1 and 7), or for "heating of a mechanical structure of an automotive vehicle"

(claim 4), *see id.* at 22. These patent claims clearly require an actual automotive application, not the mere capacity for such use. *Cf. Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117–18 (Fed. Cir. 2002) (emphasizing the "programmable" claim language in *Intel*, and observing that "*Intel* . . . does not stand for the proposition . . . that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent.")

Pacholok's argument about offers for sale is more persuasive, however. It is true that Induction does not infringe the '096 or '590 patent by selling its induction heaters for non-automotive uses; however, Induction does infringe the patents by offering to sell for automotive uses a heater ultimately purchased for other applications. *See* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, *offers to sell*, or sells any patented invention, within the United States . . . , infringes the patent.") (emphasis added). For an offer for sale to constitute patent infringement, the offer "must meet the traditional contract law definition of that term"—in other words, it must communicate a willingness to enter into a bargain, such that another person would be justified in believing that his assent to the bargain will result in a binding contract. *Superior Indus., LLC v. Thor Global Enters. Ltd.*, 700 F.3d 1287, 1294 (Fed. Cir. 2012) (citing *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005)). A true offer includes price terms. *See id.*

We know that Induction advertised its heating products, and that nearly all of this advertising focused on the automotive-repair market. *See* [236] at 5 ¶ 14; August 19, 2015 Deposition of Thomas Gough, [219-3] at 91, Tr. at 267:11–:18. We do not know if the advertisements also included price terms, but it is reasonable to assume that at least some of them did. Advertising commonly includes pricing, and there is no reason to suppose that all of Induction's advertisements strayed from this approach. There is an issue of fact as to whether Induction may properly exclude all of its "non-automotive" sales from the royalty base.

### 4. Foreign Sales

Induction argues that foreign sales—*i.e.*, sales of Induction products overseas—should be excluded from the royalty base because: (1) it is not Induction who makes those sales, but a separate company; and (2) foreign sales are not "covered" by the '096 or '590 patent in any event. In arguing that U.S. patents can never reach foreign sales, Induction casts too wide a net.

Induction is correct that its "foreign exploitation of a patented invention" does not constitute infringement of a U.S. patent. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) (citation omitted); *see also id.* ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad." (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972), superseded by statute as recognized in *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 444–45 (2007))); *Microsoft*, 550 U.S. at 454–56 (discussing the presumption against extraterritoriality). But U.S. patent

law does protect against the domestic manufacture of patented inventions. *See* 35 U.S.C. § 154(a)(1) ("Every patent shall . . . grant to the patentee . . . the right to exclude others from *making*, using, offering for sale, or selling the invention throughout the United States . . . .") (emphasis added). A manufacturer that makes patented products in the U.S. is liable for infringement, *see id.* § 271(a), and if the manufacturer then sells those goods overseas, it may owe to the patentee profits from foreign sales, *see WesternGeco L.L.C. v. ION Geophysical Corp.*, 791 F.3d 1340, 1352 (Fed. Cir. 2015). Induction owes to Pacholok a royalty based on the sale of goods that practice the '096 or '590 patent. If Induction makes such goods domestically but then sells them to foreign buyers, these are still sales of patented goods and must be included in the royalty base.

There is evidence reasonably suggesting that Induction makes its products in the United States. *See* Astrowski Deposition, [219-2] at 99–100, Tr. at 98:2–99:8 (stating that Induction performs the final assembly of the MD-800 and Pro-Max CE products in Elgin, Illinois); Gough Deposition, [219-3] at 47–48, Tr. at 223:4–224:13 (stating that Induction does the final assembly of the MD-700, Glass Blaster, Inductor Max, Pro-Max, and MiniDuctor units); *see also Deepsouth*, 406 U.S. at 527–28 (explaining that a patented product is "made," within the meaning of 35 U.S.C. § 271, where it is assembled as an operable whole). But, says Induction, what it does not do is *sell* any of its products overseas: foreign sales are carried out by another company, Induction International, Inc. *See* [235] at 11; [240] at 5 ¶ 19. So, the argument goes, foreign sales must be excluded from the royalty base because

they are not sales made by "the Corporation"—*i.e.*, Induction Innovations. *See* [235] at 11.

Pacholok argues that "the Corporation" necessarily includes Induction International, not just Induction Innovations (referred to simply as "Induction"), because the former is the latter's subsidiary, and the Stock Purchase Agreement is binding upon Induction's affiliates. *See* [240] at 25. There is some dispute about whether International is actually Induction's subsidiary, but the question is irrelevant. The contract says nothing about its enforceability against the parties' affiliates; it states only that, in addition to the parties, the agreement "shall be binding upon . . . their respective successors, heirs, and assigns." [173-4] at 4 ¶ 10(b). Pacholok makes no argument, and there is no evidence suggesting, that Induction International is a successor, heir, or assign of Induction Innovations.

But this does not end the matter as to foreign sales because, as Pacholok correctly observes, Induction may be deemed responsible for sales made by International if, in making those sales, International acted as Induction's agent. *See, e.g.*, *Buckner v. Atl. Plant Maint., Inc.*, 182 Ill.2d 12, 24 (1998) ("[T]he acts of an agent are considered in law to be the acts of the principal . . . .") (citation omitted); *McRaith v. BDO Seidman, LLP*, 391 Ill.App.3d 565, 589 (1st Dist. 2009) ("Generally, the knowledge and conduct of agents are imputed to their principals.") (citation omitted). An agency relationship usually exists where "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent

manifests assent or otherwise consents so to act." *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011) (quoting Restatement (Third) of Agency § 1.01 (2006)) (applying Illinois law); *see also Zahl v. Krupa*, 365 Ill.App.3d 653, 660 (2d Dist. 2006) (explaining that agency is a fiduciary relationship in which "the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf") (citation omitted). The existence or scope of an agency relationship is typically a question of fact. *See Clarendon*, 645 F.3d at 935 (citation omitted).

Here, there is evidence that International was acting on Induction's behalf when it sold Induction's products to foreign buyers abroad. *See* Gough Deposition, [219-3] at 49, Tr. at 225:13–:16 (Question: "Induction International, Inc. sells Induction Innovation, Inc.'s products overseas for Induction Innovations, Inc., correct?" Answer: "Yeah, correct."). This evidence is enough to permit the inference that Induction authorized International to make foreign sales for Induction's benefit. There is thus a question of fact about whether these sales may be imputed to Induction (and, therefore, counted toward the royalty base).

## IV.     Conclusion

Multiple issues of fact preclude a determination that Induction has calculated properly its royalty obligations to Pacholok. Accordingly, it cannot be resolved as a matter of law that Induction owes Pacholok no royalty payments under Section 3(e) of the Stock Purchase agreement. Plaintiffs' motion for summary judgment, [170], is therefore denied.

ENTER:

Manish S. Shah
United States District Judge

Date:  12/31/15